2001 UT App 12

**STATE of Utah, Plaintiff and Appellee,**

v.

**Barbara J. DeHART, Defendant and Appellant.**

**No. 990793–CA.**

Court of Appeals of Utah.

Jan. 11, 2001.

Rehearing Denied Jan. 31, 2001.

G. Fred Metos, McCaughey & Metos, Salt Lake City, for Appellant.

Mark L. Shurtleff, and Laura B. Dupaix, Assistant Attorney General, Salt Lake City, for Appellee.

Before JACKSON, P.J., BENCH and BILLINGS, JJ.

## OPINION

BILLINGS, Judge:

¶1 Barbara DeHart (defendant) appeals her conviction of obstruction of justice, a second degree felony. Defendant contends the trial court erred by allowing the jury to hear certain statements she made without first requiring the State to establish the corpus delicti by independent evidence. Defendant also contends there was insufficient evidence to convict her of obstructing justice. We affirm.

## FACTS

¶2 On appeal from a jury verdict, "we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶2, 6 P.3d 1116.

¶3 In September 1998, in Cataldo, Idaho, defendant left her husband of twenty-six years and moved in to the house of her neighbor, John Pinder (Pinder). Defendant and Pinder traveled to Utah from Idaho several times in late September and October 1998 to move some of Pinder's belongings

from Pinder's ranch in Duchesne, Utah, and his parents' home in Park City, Utah, to Idaho. Defendant and Pinder returned to the ranch in Duchesne on October 23.

¶ 4 On October 26, defendant made two telephone calls to her daughter in Cataldo, Idaho. During the first conversation, defendant told her daughter she was upset because Pinder and his ranch hand, Filo Ruiz, had been out all night and she suspected Pinder was cheating on her. Defendant ended the conversation with her daughter when Pinder drove up in his truck. In the second conversation, which took place about one half hour later, defendant sounded upset. She said things were in "a big mess" in Utah, that she could not tell her daughter about it over the telephone, but that it was "just horrible." She said she wanted to return home to Idaho.

¶ 5 Defendant also called her husband in Idaho on October 26. During that conversation, she said that "things had happened." She was upset, distressed, and sounded scared.

¶ 6 On October 30 and 31, 1998, Duchesne County sheriff's deputies found the remains of body parts of Rex Tanner, an employee of Pinder, and Tanner's girlfriend, on the Pinder ranch. The medical examiner determined that Tanner had died from gunshot wounds and that both bodies had been blown up with explosives after death.

¶ 7 Defendant and Pinder arrived in Idaho in Pinder's pickup truck on the morning of October 31. Because defendant's husband was away for the weekend, Pinder and defendant stayed in the DeHarts' house in Cataldo. Defendant told her daughter that a murder had been committed at Pinder's ranch, that Filo Ruiz had been arrested, and that she and Pinder might be required to return to Utah for questioning.

¶ 8 The next morning, November 1, defendant told her daughter that "John [Pinder] had told her everything, that he admitted to the murders of the people on the ranch." In front of her daughter's husband, defendant told her daughter that Pinder had admitted to killing his ranch hand and the ranch hand's girlfriend. Defendant com-

mented to her daughter, "Well, I guess your soon-to-be step-daddy is a murderer." She also said, "Well, I guess your mother is a criminal and we're just like Bonnie and Clyde, always on the run."

¶ 9 Defendant also telephoned her father on November 1. She told him Pinder had killed two people by shooting them, then blowing up the bodies, and that she would be implicated in the murders because she had helped him dispose of evidence.

¶ 10 Later that afternoon, defendant told her daughter that she and Pinder were going to drive back to Utah that day in defendant's white Toyota 4-Runner, rather than Pinder's pickup truck, so they would not be recognized and stopped by police as they traveled. When they left Idaho that evening, Pinder and defendant left a maroon gym bag containing letters, identification, a bag of human hair, and a blood-spattered T-shirt, as well as some rifles, in the spare bedroom closet in the DeHarts' house.

¶ 11 Pinder and defendant returned to Utah, staying in a motel in Ogden until November 4. During this time, Pinder and defendant met once with Pinder's criminal attorneys in Salt Lake City, and Pinder spoke to them several times a day on the telephone.

¶ 12 Defendant called her husband on November 3. She asked him if police had come to his house in Idaho, where she and Pinder had stayed the previous weekend, and what the police had taken away. When her husband told defendant the police had taken the maroon gym bag, he heard Pinder shout in the background, "Thanks, Kurt. Thanks a lot. You just signed my ... death warrant."

¶ 13 Late in the evening on November 4, Pinder and defendant went to the studios of KSL Television in Salt Lake City. Pinder gave an interview to a reporter, during which defendant sat next to Pinder. During the interview, defendant displayed knowledge that the murders had occurred on the night of October 25, although police had not released the date of the murders. After the conclusion of the interview, the reporter and cameraman followed Pinder and defendant down to the parking garage, where Pinder was filmed driving away in defendant's white

4–Runner with defendant in the passenger seat.

¶ 14 Pinder and defendant drove to Mesquite, Nevada, checking in to a motel early on the morning of November 5. While checking in at the motel, defendant registered for two guests and wrote down a false license plate number for her 4–Runner.

¶ 15 On November 7, defendant arrived back in Cataldo, Idaho, where officers investigating the murders were waiting to question her. Defendant told them she had been driving Pinder around, that she had dropped him off in Las Vegas, and that she had given him her handgun.

¶ 16 Defendant was thereafter charged with one count of obstructing justice. At trial, she moved to dismiss the charge following the State's evidence, arguing the State had presented insufficient evidence to prove the corpus delicti independent of her post-crime statements. The trial court denied the motion, finding sufficient evidence had been adduced to prove the corpus delicti. The jury convicted defendant, finding in its special verdict that she "harbored or concealed the offender" and that she "provided the offender with a weapon, transportation, disguise, or other means for avoiding discovery or apprehension." [1] This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

¶ 17 Defendant first argues the State failed to establish a corpus delicti allowing admission of her out-of-court statements as a basis for her conviction. "[W]e note that the trial court's ruling that the corpus delicti rule does not bar admission of the statements is a question of law, and accordingly, our standard of review is correctness." *State v. Johnson*, 821 P.2d 1150, 1161 (Utah 1991). "However, the trial court's underlying findings of fact regarding the corpus delicti will

be overturned only if clearly erroneous." *State v. Nguyen*, 878 P.2d 1183, 1186 (Utah Ct.App.1994).

■ ¶ 18 Defendant also argues the evidence was insufficient to establish beyond a reasonable doubt that she obstructed justice. We will reverse a jury verdict for insufficient evidence "only when the evidence . . . is sufficiently inconclusive or [so] inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *State v. Brown*, 948 P.2d 337, 343 (Utah 1997).

## ANALYSIS

### I. Corpus Delicti

■ ¶ 19 Defendant argues the statements she made implicating herself in covering up the murders were improperly considered as the State failed first to show independent evidence of a corpus delicti for obstructing justice. Defendant asserts that other than her statements to her daughter, her husband, her father, and the police, the evidence presented to the jury was insufficient to establish a corpus delicti. "The corpus delicti rule states that before a defendant's inculpatory statements can be introduced against the defendant, the state must prove the occurrence of a crime, i.e., a corpus delicti." *Johnson*, 821 P.2d at 1162. "Under the Utah corpus delicti rule, before [a defendant's] post-crime inculpatory statements are admissible [against him or her], the State must show by clear and convincing evidence that (i) a wrong was done and (ii) such wrong was the result of criminal conduct." *Id.* at 1164. For purposes of establishing a corpus delicti, the State need not show by "independent evidence 'that the accused was the guilty agent.'" *Johnson*, 821 P.2d

1. On its special verdict, the jury failed to find that defendant "concealed, destroyed, or altered any physical evidence that might aid in the discovery, apprehension, or conviction of the person." On November 1, defendant told her daughter that she and Pinder had taken his pickup truck to a carwash and had cleaned blood from the cab, and that defendant had found bloody hair and scalp, assumed by defendant to be the girlfriend's, in a bag beneath the passenger seat and had thrown the remains away. Defendant also said she and Pinder had burned Pinder's bloody clothes and thrown the murder weapon, Pinder's gun, off a bridge into a river. Since the jury acquitted defendant on this version of obstructing justice, we need not consider whether this portion of defendant's November 1 statement was improperly considered as a corpus delicti had not been established for this destruction of evidence variation of obstructing justice.

at 1162 (citations omitted). "The rule is designed as a 'safeguard against convicting the defendant on the strength of false confessions.'" *Id.* (citations omitted).

¶ 20 However, *"the corpus delicti rule is inapplicable to statements made prior to or during the commission of a crime." Id.* (emphasis added). This is so because "statements made prior to the commission of a crime [do] not 'contain [any] of the inherent weaknesses of confessions or admissions after the fact,' and, therefore, the corpus delicti doctrine's requirement of corroboration [is] not necessary." *Id.* (quoting *Warszower v. United States,* 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941) (second alteration in original)).

¶ 21 In *Johnson,* the defendant was convicted of attempting to murder her husband by poisoning him with heroin, amphetamines, and oxalic acid. *See id.* at 1153. She asserted on appeal that statements she had made concerning the crimes were improperly admitted because the State had failed first to prove by independent evidence a corpus delicti. *See id.* at 1157. Upon examination of the evidence before the trial court, our supreme court stated, "the evidence shows that *prior to the administration of the heroin, Johnson made statements indicating that she wanted to use it to overdose her husband. Under the pre- and post[-]crime distinction [we have adopted] these remarks were not covered by the corpus delicti rule and were admissible as statements against interest." Id.* at 1164 (emphasis added).

¶ 22 The court went on to hold, "[h]owever, incriminating statements after she administered the heroin to her husband are subject to the corpus delicti rule." *Id.* The court concluded that although the trial court had erred in ruling the latter (post-crime) statements not covered by the corpus delicti rule, the error was harmless because the State presented clear and convincing evidence of a wrong and that the wrong was caused by unlawful means. *See id.*

¶ 23 In this case, defendant argues that her statements, which she admits were made prior to and during her commission of the crime of obstructing justice, should not be subject to the corpus delicti rule because they lack credibility and therefore fall within the policy articulated in *Johnson.* We conclude that stare decisis compels us to distinguish between post-crime statements, which are subject to the corpus delicti requirement of independent corroboration, and statements made prior to or contemporaneously with the commission of a crime, which are not subject to the corpus delicti rule. *See Johnson,* 821 P.2d at 1164.

¶ 24 Defendant obstructed justice when she allowed Pinder to stay with her in her Idaho home from October 30 until November 1, drove Pinder from Idaho to Utah and Nevada from November 1 until November 5, and gave him her handgun on November 5, when she dropped him off outside Las Vegas. Before and during the commission of these acts, defendant made several statements indicating that she knew Pinder had committed the murders and was helping him. On November 1, she told her daughter that Pinder had admitted to the two murders at the Duchesne ranch. She told her daughter that her "soon-to-be step-daddy" was a "murderer," and stated that she herself was "a criminal" and "just like Bonnie and Clyde, always on the run." Furthermore, defendant telephoned her father and told him that Pinder had shot and killed two people, then blown up the bodies. Defendant also told her daughter that she and Pinder were driving defendant's 4–Runner, instead of Pinder's blue pickup, back to Utah to avoid the notice of police. These statements, all made on November 1, come within the exception to the corpus delicti rule articulated in *Johnson* because they are "statements made prior to or during the commission of a crime," to which the corpus delicti rule does not apply. *Johnson,* 821 P.2d at 1162. Thus, these statements were properly admitted to establish a corpus delicti for obstructing justice.

¶ 25 However, defendant's statements to investigating officers when she arrived back in Idaho on November 7, after leaving Pinder in Nevada, were made following the commission of her crime. Because post-crime inculpatory statements may not be used to establish a corpus delicti, *see Johnson,* 821 P.2d at 1162, her statements to

the officers that she had been driving Pinder around, that she had dropped him outside Las Vegas, and that she had given him her handgun may not serve to establish a corpus delicti for defendant's obstructing justice.

■ ¶ 26 Thus, before admitting defendant's November 7 statements to the officers, the State was required to prove by clear and convincing evidence that "a wrong, an injury, or a damage [had] been done," and that it had been "effected by a criminal agency." *Johnson*, 821 P.2d at 1162. We conclude the State established by clear and convincing evidence a corpus delicti independent of defendant's post-crime inculpatory statements to officers on November 7.[2]

¶ 27 Defendant was convicted under Utah Code section 76–8–306, which states, in relevant part,

(1) a person is guilty of an offense, if with intent to hinder, prevent, or delay the discovery, apprehension, prosecution, conviction, or punishment of another for the commission of a crime, he:

. . .

(b) harbors or conceals the offender;

(c) provides the offender a weapon, transportation, disguise, or other means for avoiding discovery or apprehension[.]

Utah Code Ann. § 76–8–306 (1998). According to the special verdict form, the jury found that defendant had "harbored or concealed the offender" and that she "provided the offender with a weapon, transportation, disguise, or other means for avoiding discovery or apprehension." We conclude there was clear and convincing evidence of the corpus delicti without defendant's November 7 statements.

¶ 28 First, the State provided evidence that defendant harbored or concealed Pinder. *See id.* § 76–8–306(1)(b) (1998). The testimony of defendant, defendant's daughter, and the daughter's husband clearly showed that Pinder and defendant spent the weekend of October 30 through November 1 at the DeHarts' Idaho home, during which time defendant admitted knowing Pinder had committed the murders. Moreover, although defendant testified she dropped Pinder off at a truck stop outside Las Vegas before checking in to a motel in Mesquite, Nevada, there was evidence that she registered under her name for two people at the motel, leading to the inference that Pinder was with her.

¶ 29 In addition, it is undisputed that defendant provided Pinder with transportation. *See id.* § 76–8–306(1)(c). There was testimony that beginning on November 1, defendant and Pinder drove defendant's 4–Runner, rather than Pinder's pickup, from Idaho back to Utah and Nevada. Videotape evidence further showed the couple driving away from KSL studios in the 4–Runner following Pinder's November 4 interview.[3]

¶ 30 Finally, the jury heard evidence that defendant knew Pinder had committed the murders and had an "intent to hinder, prevent, or delay the discovery, apprehension, prosecution, conviction, or punishment." *Id.* § 76–8–306(1). Defendant's daughter testified that defendant told her on November 1 that Pinder had confessed to the murders. Moreover, defendant told her daughter that she and Pinder were taking the 4–Runner to avoid the notice of police who might recognize Pinder's pickup. In addition, defendant called her husband to find out whether investigators had come to Idaho in search of Pinder and her, and whether they had taken away any of Pinder's belongings, specifically

---

**2.** In this case, in addition to establishing a corpus delicti, the State established that defendant committed each element of the charged crime. We note, however, that establishing a corpus delicti does not require a link between the defendant and the crime. *See Nguyen*, 878 P.2d at 1188 (stating that "evidence of a corpus delicti need not connect the defendant with the crime charged"); *State v. Cazier*, 521 P.2d 554, 555 (Utah 1974) (noting that corpus delicti of crime "is quite apart from the question as to who committed it, or whether the accused was involved").

**3.** Without defendant's November 7 statements to officers in Idaho, the independent evidence that defendant provided Pinder with a weapon may not rise to clear and convincing, the required quantum to establish a corpus delicti. However, because clear and convincing independent evidence established that defendant harbored or concealed Pinder and that defendant provided Pinder with transportation, we affirm the jury's verdict on those grounds.

the maroon gym bag and its contents. In Mesquite, defendant gave a false license plate number and number of occupants when she registered at the motel. From this evidence, it is clear that defendant helped Pinder avoid the authorities until he was ready to turn himself in. This evidence established a corpus delicti for obstructing justice, even without defendant's November 7 statements to police investigators.

## II. Did Sufficient Evidence Support the Guilty Verdict

¶ 31 Defendant asserts there was insufficient evidence supporting the jury's verdict that she was guilty of obstructing justice. However, as set out in detail above, sufficient evidence was produced on each element of defendant's crime, and we cannot say this evidence was "so inconclusive or so inherently improbable" that a reasonable jury must have entertained doubts as to her guilt. *State v. Brown,* 948 P.2d at 343.

## CONCLUSION

¶ 32 We conclude that defendant's November 1 statements to her daughter and her father were made prior to or during the commission of her crime and were therefore not subject to the corpus delicti rule. The statements were thus properly admitted for the purposes of establishing a corpus delicti. We further conclude a corpus delicti was established by clear and convincing evidence independent of defendant's post-crime statements. Finally, we conclude that sufficient evidence was presented on each element of the crime to support the jury's verdict of obstructing justice. Therefore, we affirm defendant's conviction.

¶ 33 WE CONCUR: NORMAN H. JACKSON, Associate Presiding Judge, and RUSSELL W. BENCH, Judge.