*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2015 UT 56**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JOHN R. PINDER,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20121038
Filed July 21 , 2015

Fourth District, Heber Dep't
The Honorable Lynn W. Davis
No. 060500155

Attorneys:

Brent Gold, Park City, Andrew Parnes, Ketchum, Idaho,
for appellant

Sean Reyes, Att'y Gen., Brett J. DelPorto, Ass't Att'y Gen.,
Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, JUSTICE PARRISH, and JUDGE CHRISTIANSEN joined.

Due to his retirement, JUSTICE NEHRING did not participate herein; COURT OF APPEALS JUDGE MICHELE M. CHRISTIANSEN sat.

JUSTICE DENO G. HIMONAS became a member of the Court on February 13, 2015, after oral argument in this matter, and accordingly did not participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1   John Pinder was convicted of two counts of aggravated murder and related crimes in 2000. We affirmed those convictions in *State v. Pinder*, 2005 UT 15, 114 P.3d 551. Pinder subsequently filed a petition for relief under the Post-Conviction Remedies Act

(PCRA). The district court dismissed Pinder's PCRA claims on summary judgment, and this appeal followed.

¶2    Pinder asserts two sets of claims for relief. First, he presents testimony from two new witnesses, purportedly to establish that he was not the killer. Second, he asserts that the State knowingly introduced perjured testimony and fabricated evidence at trial, in violation of his right to due process. Pinder challenges the district court's dismissal of those claims. And he also finds error in the court's refusal to grant his motions for discovery and to amend his PCRA pleadings.

¶3    We affirm. Pinder's newly discovered evidence claims fail on their merits, as he has failed to demonstrate that a reasonable jury could not enter a judgment of conviction in light of the new testimony he identifies. The due process claims, on the other hand, are procedurally barred. And finally, there was no abuse of discretion in the denial of Pinder's discovery motion and motion to amend.

I

¶4    John Pinder owned a sprawling ostrich ranch in Duchesne County. He and his ranch-hand, Filomeno Ruiz, were accused (and ultimately convicted) of murdering June Flood and Rex Tanner. Flood and Tanner also worked on Pinder's ranch.

¶5    According to the evidence at trial,[1] Ruiz staged a fight with his girlfriend, Mandy Harris, on the day of the alleged murder. The purpose of the staged fight was to get Harris away from the ranch. Ruiz called 911 during this staged altercation. Harris left after the police showed up. And the 911 call was recorded by the local dispatch.

¶6    That evening, Pinder, his girlfriend Barbara DeHart, Ruiz, and Pinder's employees Joe Wallen and David Brunyer (along with Brunyer's wife) gathered around a campfire to drink. At some point the conversation turned to the "shrunken heads" that Pinder and DeHart had seen at a curiosity shop in Seattle. Eventually Pinder spoke of his hopes to someday acquire one. Pinder

---

[1] The statement of facts below is presented in a light favorable to the prosecution, and consistent with the judgment of conviction.

said to Ruiz, "let's go get some heads." Ruiz responded with a question: "four or two?" Pinder replied, "two."

¶7    After grabbing a baseball bat, Pinder and Ruiz drove to the home where Flood and Tanner resided. Pinder violently assaulted Flood and Tanner, kidnapped them, and then shot them both with a 10 mm pistol. Pinder and Ruiz then left the murder scene and later returned with ammonium nitrate and dynamite, packed the bodies with the explosives, and set them off.

¶8    Pinder later got others to help him hide the remains. Following a day of bulldozing the blast site, Pinder and Ruiz dropped several black garbage bags of body parts into a barrel and set them ablaze. Pinder, DeHart, and Ruiz then met with the Brunyers for dinner, after which Pinder and Ruiz returned to the lake to collect more parts for burning.

¶9    Tuesday morning, at Pinder's behest, Ruiz and Brunyer went to the Flood home armed with a bottle of alcohol and some rags to remove fingerprints and tidy up. After returning, Brunyer complained about the smell of the Flood residence, to which Pinder quipped, "[T]hat's because [Tanner] shit his pants when I shot him." Pinder, Ruiz, and Brunyer then spent the day bulldozing and gathering more body parts for disposal. After coming across Tanner's wrist watch, Pinder callously joked that it must have been a Timex, because "it was still ticking." Eventually the bulldozer ran out of gas. And when they went to get more, Brunyer asked Pinder why he killed Flood and Tanner, to which Pinder replied, "[T]hey were liars, thieves and maggots, and now they're vaporized . . . no one will miss them anyway." Upon arriving home that evening, Brunyer's daughter could see he was upset. He recounted the gruesome tale to his daughter. She took notes and then taped them to the inside of her dresser drawer after having Brunyer read over and approve them.

¶10  By Thursday, October 29th, Pinder and DeHart had left the state, eventually arriving in Cataldo, Idaho. That Sunday, DeHart contacted her daughter Melissa Cowles and told her that over the last couple of days Pinder "had admitted to killing some people on the ranch"; that they had been "[c]leaning up the evidence"; that she had found "a bag of . . . what looked like bloody hair and scalp" in Pinder's truck, which she then threw away; and that

they had "thrown the murder weapon off [a] bridge and into the river." DeHart had said they were "like Bonnie and Clyde, always on the run." That same day DeHart called her father, Bernie Knapp, and told him "she helped clean blood and mess out of [John Pinder's] truck," that "they had some bloody clothing and items in bags that they had [tossed in dumpsters in] little towns on the way up on their trip," and that they "either had gotten rid of a gun or were in the process of getting rid of a gun."

¶11 Meanwhile, back at the ranch, an investigation was underway. One of Flood's friends reported her missing, and police officers searched the Flood residence. Police discovered the home in utter disarray, with blood on the bed sheets and the backrest of a chair in the living room. They also found a pair of excrement-stained pants in the bathroom. After leaving the home, the investigating officer saw and approached Brunyer, who was standing nearby. Brunyer appeared "[v]ery agitated, very nervous, [and] scared to death," but handed the officer the letter his daughter had written and the bottle of alcohol with which he had assisted in cleaning up the home.

¶12 Pinder and DeHart arrived back in Salt Lake on November 4th. On that day they decided to appear on KSL News for a television interview about the murders. Shortly thereafter, Pinder, Ruiz, and DeHart were all arrested. Investigators later searched Pinder's ranch and found a gruesome assortment of the victims' remains strewn about the area, stuck in bushes, and hanging from trees. They also searched Pinder's truck and found a 10 mm shell casing, one of the victim's thumbprints on the inside of a window, and some bloodstains (one identified as Pinder's, the other unidentified). Police also determined that the rear windows had been wiped down and cleaned, as well as the mid-section of the door jam.

¶13 Ruiz pled guilty to two counts of murder. He denied being the shooter, accusing Pinder instead. DeHart was charged with and later convicted of obstruction of justice. *State v. DeHart*, 2001 UT App 12, 17 P.3d 1171. And Pinder was charged with two counts of aggravated murder, two counts of aggravated kidnapping, two counts of tampering with evidence, one count of burglary of a dwelling, one count of possession of explosives, and two counts of desecration of a body.

¶14 While being held in the Summit County Jail before his preliminary hearing, Pinder met an inmate named Newly Welch. Pinder bragged to Welch about killing Tanner and Flood and blowing up their bodies. He told Welch that the day of the murders, he and Ruiz staged a fight with Ruiz's girlfriend to get her off of the ranch. Welch then asked Pinder what it was like to kill someone. And in response, Pinder put his hand on Welch's shoulder and said, "[T]here's no bigger rush[,] especially when you know you're going to get away with it." Pinder was convicted on all counts and sentenced to life with the possibility of parole on the aggravated murder charges, and to consecutive statutory terms on the other counts.

¶15 Pinder filed a motion for a new trial. For various reasons, the motion took two years to resolve. During the eventual evidentiary hearing on the new trial motion, Pinder presented several newly discovered witnesses—Joey Silva (an inmate who allegedly spent time with Ruiz), Robert Brunyer (David Brunyer's brother), and Kristy Barnes. Each of these witnesses testified, in one way or another, that Ruiz and David Brunyer were actually the killers. The district court found none of the new witnesses credible; indeed, the court expressly found each of them to be seriously lacking in trustworthiness and accordingly denied the motion. Pinder appealed, and we unanimously affirmed his conviction. *State v. Pinder*, 2005 UT 15, 114 P.3d 551.

¶16 Pinder filed this petition for post-conviction relief in 2006. He presented two main theories of relief. First, he claimed that newly discovered evidence would exonerate him. Pinder brought affidavits from two more inmates who had spent time with Ruiz while incarcerated: Beau Heaps and Danny Alvarez. The Alvarez affidavit stated that while in the Duchesne County Jail, Ruiz told Alvarez that he and a "gavacho"[2] committed the murders but that Pinder had "nothing to do with it." The Heaps affidavit stated that Heaps met Ruiz at the Utah State Prison and that Ruiz similarly told him that Ruiz and another man—not Pinder—were the murderers.

---

[2] This was an apparent reference to Pinder, or at least to a white man. *See* WEBSTER'S NEW WORLD SPANISH DICTIONARY 229 (1992) (defining "gabacho," as used in Mexico, as "foreigner").

¶17  Pinder's second claim was based on the allegation that the State had violated his due process rights by knowingly presenting perjured testimony from Welch and by falsifying evidence concerning the 911 recording of the fight between Ruiz and Harris. To support his claims regarding Welch, Pinder provided an affidavit from a defense investigator who claimed that Welch admitted to lying on the stand but that he would not testify regarding his own perjury until "he was released from probation." With respect to the 911 tapes, Pinder submitted lengthy expert analyses of the 911 recordings of the Ruiz/Harris "fight." This analysis concluded that the 911 call recordings from the days of October the 24th and 25th were "not pristine," had in some way been "altered" and "tampered with by exporting and editing," and that these files could not "be deemed reliable." Based on these expert reports, Pinder concluded that: (1) the police had altered the recordings of the 911 call to make the Ruiz/Harris fight appear to have happened on Sunday the 25th rather than on Saturday the 24th; and (2) the State then used this fabricated date as a "baseline" in order to coax witnesses at trial to believe that all the events happened on Sunday rather than Saturday.

¶18 Discovery lasted three years, largely because of a drawn out battle over disqualification of the district court judge. During this time, both Ruiz and Alvarez were deposed. In 2009, at the close of discovery, the State moved for summary judgment on several grounds. The State first addressed the newly discovered evidence claims, arguing that they "could . . . have been discovered through the exercise of reasonable diligence," UTAH CODE § 78B-9-104(1)(e)(i), were merely cumulative of other evidence, were merely for impeachment, and in any event would not have changed the outcome of trial. Turning to the due process claims, the State first invoked the procedural bar limitations in the PCRA. UTAH CODE § 78B-9-106(1)(c). It argued that the due process claims "could have been but [were] not raised at trial or on appeal," or during Pinder's new trial motion. *Id.* Next, the State argued that Pinder failed to establish that the State "knew or had reason to believe Welch's testimony was false." Over a year later, Pinder filed a response, a motion to amend the petition, and a motion for additional discovery.

¶19 The district court granted summary judgment in favor of the State. It first held, with respect to new evidence, (1) Pinder failed to show that the Heaps and Alvarez testimony could not have been discovered by the exercise of reasonable diligence, (2) the evidence was merely cumulative and merely for impeachment, and (3) even if the evidence were considered, it did not establish that the newly discovered evidence would make it impossible for a reasonable jury to render a guilty verdict. Turning to the due process claims, the court dismissed them both as procedurally barred because they could have been brought "during Pinder's motion for a new trial or on appeal." The court also ruled on the merits of both the Welch claim and the 911 claim, holding that Pinder had failed to shoulder his burden of showing that the State knew or should have known that both the Welch testimony and the 911 tapes were false. The court never expressly addressed Pinder's motion for additional discovery. But it effectively denied the motion by granting the State's motion for summary judgment. As for the motion to amend, the court denied it in its order granting summary judgment, but without explaining its reasons for doing so.

¶20 Pinder filed this appeal. In considering his challenge to the district court's summary judgment decision, our review is de novo. *Archuleta v. Galetka*, 2011 UT 73, ¶ 25, 267 P.3d 232. As for the district court's mixed determinations denying Pinder's motion to conduct further discovery and motion to amend, we review them under an abuse of discretion standard. *See Workers Comp. Fund v. Utah Business Ins. Co.*, 2013 UT 4, ¶ 7, 296 P.3d 734; *Dahl v. Dahl*, 2015 UT 23, ¶ 162, 345 P.3d 566.

II

¶21 The PCRA provides post-appeal means for challenging a prior conviction. UTAH CODE § 78B-9-104(1). Two of the PCRA's provisions for relief are implicated here. First is the provision authorizing a person to seek relief based on a showing that "newly discovered material evidence exists that requires the court to vacate the conviction." *Id.* § 78B-9-104(1)(e). Second is a provision authorizing a person to challenge a conviction that "was obtained . . . in violation of the United States Constitution." *Id.* § 78B-9-104(1)(a). Pinder brings two claims under each of these provisions. As to new evidence, Pinder claims that the testimony of Heaps

7

and Alvarez demonstrates that Ruiz and Brunyer were the killers. And as to the claim that his conviction was obtained in violation of the Constitution, he contends that the testimony of Newly Welch was perjured and that the date of the 911 call was falsified, such that use of this evidence violated his rights to due process. We reject each claim for the reasons set forth below.

¶22 First, neither the Heaps nor the Alvarez testimony could have been discovered with reasonable diligence. So Pinder's argument can advance beyond that phase of the inquiry. But Pinder fails to show that no reasonable fact finder could convict him in light of this new evidence. We reject his newly discovered evidence claims on that basis.

¶23 Second, both of Pinder's due process claims are procedurally barred because they could have been but were not brought at trial or on appeal. Moreover, Pinder has not properly invoked any of the so-called common law exceptions to the PCRA available to him as a pre-2008 filer under *Hurst v. Cook*, 777 P.2d 1029 (Utah 1989).

¶24 Finally, we see no abuse of discretion by the district court in denying Pinder's motions for additional discovery and to amend. The district court did not give its reasons for denying these motions, but we affirm on grounds apparent on the record—because both motions were filed at an advanced stage of the litigation and because the discovery motion was never properly noticed for decision.

## A. Newly Discovered Evidence

¶25 Pinder's first assertion in his petition is that he has discovered new evidence—the testimony of inmates Beau Heaps and Danny Alvarez—that would eliminate any basis for a reasonable judgment of conviction. *See* UTAH CODE § 78B-9-104(1)(e). Both inmates alleged that Ruiz confessed that he was in fact the triggerman and that his accomplice was not Pinder but Brunyer. In the State's view, however, Pinder has failed to shoulder his burden of showing that he did not know (or could not have known through the exercise of reasonable diligence) about Heaps's testi-

mony in time to include it in Pinder's post-trial motion,[3] *see id.* § 78B-9-104(e)(i); that the evidence is more than "merely cumulative of evidence that was known" and more than "merely impeachment evidence," *id.* § 78B-9-104(e)(ii)–(iii); and that when taken together "with all the other evidence" this testimony demonstrates that "no reasonable trier of fact could have found" Pinder guilty. *Id.* § 78B-9-104(1)(e)(iv). We agree with Pinder on the first point. But we affirm on the ground that the evidence would not have made any difference anyway.

¶26 First, we conclude that Pinder has met his burden of showing that the Heaps testimony was not known to Pinder and "could not have been discovered through the exercise of reasonable diligence," *id.* § 78B-9-104(1)(e)(i), at least when the reasonable inferences due Pinder as the nonmoving party are taken into account. *See Torrie v. Weber Cnty.*, 2013 UT 48, ¶ 7, 309 P.3d 216 ("[We] . . . view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." (internal quotation marks omitted)). As Pinder notes, Heaps testified in his affidavit that "he met Ruiz at the State prison." Moreover, Pinder asserts—and it is undisputed—that Pinder was housed in the Wasatch County Jail throughout the proceedings in the trial court (including the new trial motion).[4] These allegations may not mandate the conclusion that Pinder was ignorant of the Heaps-Ruiz conversation. It is conceivable that Pinder and Heaps knew each other prior to Pinder's transfer to the state prison. Or that they were corresponding while Pinder was housed at the Wasatch County Jail during Pinder's proceedings in the trial court. But requiring Pinder to disprove that series of events through direct evidence is not what is required on summary judgment. Pinder is required only to put on evidence that produces a reasonable infer-

---

[3] Below, the State conceded the reasonable diligence prong of the newly discovered evidence analysis. Surprisingly, the district court nonetheless held that Pinder could have discovered this evidence by the exercise of reasonable diligence. On appeal the State confesses error as to this matter. Accordingly, we address only the reasonable diligence inquiry with respect to the Heaps testimony.

[4] Though he did have a small stint at the Duchesne County Jail. *Supra* ¶ 16.

ence that he did not know about the conversation between Heaps and Ruiz until after his new trial motion. And we are convinced that he has done so.

¶27 Similarly, we are satisfied that Pinder has met his burden of demonstrating that "the exercise of reasonable diligence" would not have led him to have discovered the Heaps testimony before he filed the new trial motion. Perhaps counsel could have subpoenaed and deposed every inmate with whom Ruiz may have had contact while being housed at the state prison. But the PCRA does not require such heroic efforts; it requires only reasonable diligence.

¶28 That said, Pinder still falls short of carrying the burden assigned to him under the PCRA. To succeed in advancing his new evidence claims under the PCRA, Pinder must establish three other elements. First, he must demonstrate that the evidence was not "merely cumulative of evidence that was known." *Id.* § 78B-9-104(1)(e)(ii). Second, he must establish that it was not "merely impeachment evidence." *Id.* § 78B-9-104(1)(e)(iii). And finally, he must demonstrate that the newly discovered evidence—when "viewed with all the other evidence"—is such that "no reasonable trier of fact could have found the petitioner guilty." *Id.* § 78B-9-104(1)(e)(iv). These elements are listed separately. But as applied here, they overlap substantially, in a manner reinforcing a unifying principle: a petitioner seeking to challenge a new conviction on the basis of new evidence must establish that the new evidence is truly new and clearly would have made a difference.

¶29 The elements of a newly discovered evidence claim under the PCRA trace their roots to the historical standard governing motions for a new trial—a standard first articulated in *Berry v. State*, 10 Ga. 511 (Ga. 1851). Long before the adoption of the PCRA, our court embraced the standard set forth in *Berry*.[5] The

---

[5] *See State v. Gellatly*, 449 P.2d 993, 995–96 (Utah 1969) ("Newly discovered evidence, to be a ground for a new trial, must fulfill the following requirements: (1) It must be such as could not with reasonable diligence have been discovered and produced at the trial; (2) it must not be merely cumulative; (3) it must be such as to

*Berry* test listed the consideration of the merely "cumulative" nature of the evidence as separate from the analysis of the effect on the result. *Id.* at 527–28. Yet under longstanding caselaw, these elements are viewed as overlapping and mutually reinforcing.

¶30 The Virginia Supreme Court may have put it best:

> Evidence is said to be cumulative when it is of the same kind, to the same point, and the discovery of such evidence after verdict is, as a rule, no ground for a new trial. Its exclusion, however, *is not by virtue of any independent rule*, but rather as a *corollary* of the rule that the newly discovered evidence *must be such as would probably produce a different result on the merits*. Generally, evidence that is merely cumulative, corroborative, or collateral, ought not and *probably would not* produce a different result on the merits, and *for that reason* is excluded . . . .

*Johnson v. Commonwealth*, 101 S.E. 341, 343 (Va. 1919) (emphasis added).

¶31 Thus, evidence that is cumulative (going to the same point already made at trial) or that is for impeachment (showing that a witness might not have been credible) is singled out as being *particularly unlikely* to change the result of the trial. So, under the *Berry* test, when courts inquire as to whether something is "merely cumulative" or "merely" for impeachment, they are ultimately asking whether newly discovered evidence is *weighty enough* to have changed the verdict.[6] All three inquiries reinforce a central theme. Evidence is "merely cumulative" or "merely" for "impeachment" if it is unlikely to have affected the outcome of trial.

¶32 Our longstanding caselaw in the new trial setting is to this effect. When we have spoken of "cumulative" evidence in the new

---

render a different result probable on the retrial of the case."); *accord Klopenstine v. Hays*, 57 P. 712, 714 (Utah 1899).

[6] 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, FEDERAL RULES OF CRIMINAL PROCEDURE § 584, at 461–62 (4th ed. 2011) ("The requirement that the evidence be material and not cumulative is closely related to the requirement that the evidence be such that it would probably produce an acquittal.").

trial context, it has been in highlighting such evidence as especially unlikely to change the outcome of a trial.[7] Our more recent cases are along the same lines.[8]

¶33 We interpret subsections 104(1)(e)(ii) and (iii) of the PCRA to incorporate the term-of-art-usage of "merely cumulative" and "merely impeachment" evidence as those terms are employed in the context of a new trial motion. We hold, specifically, that evidence is "merely cumulative" or "merely impeachment" evidence if it is insufficient to sustain the conclusion that "no reasonable trier of fact could have found the petitioner guilty." UTAH CODE § 78B-9-104(1)(e)(iv). And we affirm the judgment in this case on the ground that Pinder has failed to make such a showing.

---

[7] *State v. Molitz*, 122 P. 86, 88 (Utah 1912) (affirming denial of new trial motion because the newly discovered evidence "merely confirm[ed] or impugn[ed] the statements of other witnesses, *and hence nothing [was] really added to the weight of the evidence either way*" (emphasis added)); *State v. Haworth*, 73 P. 413, 414 (Utah 1903) ("Newly-discovered evidence which is impeaching is looked upon with equal distrust as cumulative evidence, and in no instance should a new trial be granted *unless it clearly appears that the newly-discovered evidence would probably change the result on a retrial.*" (emphasis added)); *Larsen v. Onesite*, 59 P. 234, 235 (Utah 1899) (affirming denial of new trial motion based on allegedly newly discovered witnesses because the testimony "was cumulative in its character" and if produced, "the findings of the trial court would [not] have been different from what they were"); *Foster v. Reich*, 1 Utah 192, 192 (Utah Terr. 1875) (affirming denial of a new trial motion because "newly discovered evidence" was only "cumulative," in that "most of it would have been *unimportant upon the trial*, had it been known and used at that time" (emphasis added)).

[8] *See, e.g.*, *State v. James*, 819 P.2d 781, 794–95 & n.41 (Utah 1991) (overturning trial court's decision that newly discovered evidence was "merely cumulative" because the evidence was "different [in] kind and nature" than the evidence introduced at trial, and hence "certainly could have a different quality in the eyes of the jurors who assess[ed] the credibility of witnesses").

¶34 The Heaps and Alvarez testimony would have supported Pinder's theory at trial (and on the new trial motion) that Ruiz was the triggerman. And it would have marginally eroded Ruiz's credibility. But there was still *plenty* of evidence to sustain a reasonable judgment of conviction. At trial, David Brunyer testified that Pinder told him: "I shot [Tanner]," that Flood and Tanner were "liars, thieves and maggots," and that Pinder "vaporized" them both. And the evidence suggested that Pinder then ordered Brunyer and others to help sanitize of the crime scene. Brunyer conveyed all of this to his daughter, who copied it down in a letter. According to DeHart's father and daughter, Pinder "admitted to killing some people on the ranch," and that Pinder and DeHart spent a few days like "Bonnie and Clyde" "[c]leaning up the evidence" and "throw[ing] the murder weapon off [a] bridge into the river." Welch also testified of Pinder's confessions.[9] According to Welch, Pinder told him nonpublic information about the case and gloated about the "rush" of killing someone "when you know you're going to get away with it."

¶35 Adding the evidence advanced by Pinder in his new trial motion—the testimony of Robert Brunyer, Kristy Barnes, and Joey Silva—changes the evidentiary picture only marginally. After various hearings on the motion, the district court found *all* of these witnesses to be seriously wanting in credibility. As to Robert Brunyer, the court found that he was "not credible" and that "much of his testimony is inconsistent with absolutely established, known undisputed facts." Kristy Barnes fared no better. Her testimony was filled with "lie[s]," and contradicted by both state and defense witnesses. And as for Joey Silva, the court found him to be a "'bamboozler' and professional scam artist." The court found "it difficult to conceive of a less trustworthy witness."

¶36 The addition of the Heaps and Alvarez testimony adds *something* to Pinder's theory that Ruiz was the one who shot Flood and Tanner. But a reasonable jury would still be well within its prerogative to convict Pinder based on the evidence it had before it. The "mere possibility" that new evidence "might have helped

---

[9] As noted below, any claim that Welch's testimony was perjured and that its introduction violated Pinder's due process rights is procedurally barred. *Infra* ¶¶ 37–41.

the defense or might have affected the outcome" is insufficient to merit relief under the PCRA. *Medel v. State*, 2008 UT 32, ¶ 50, 184 P.3d 1226 (internal quotation marks omitted).[10] Accordingly, we affirm the district court's grant of summary judgment in favor of the State as to Pinder's newly discovered evidence claims.

## B. Due Process Claims

¶37 Pinder's next grounds for relief under the PCRA are in his claims that his conviction "was obtained . . . in violation of the United States Constitution." UTAH CODE § 78B-9-104(1)(a). In this claim, Pinder argues that the State violated his rights to due process under the Fourteenth Amendment when it (1) knowingly put on Welch's perjured testimony and (2) knowingly used a falsified version of the 911 tapes to guide witnesses' testimony as to the date of the Ruiz/Harris "fight" (and hence the murders). *See Mooney v. Holohan*, 294 U.S. 103, 113 (1935) (holding that the Due Process Clause prohibits the knowing use of falsified testimony or evidence by the prosecution). The State responds by asserting that both of these claims are procedurally barred, that Pinder has not properly invoked any exceptions to the procedural bar, and that in any event the claims fail on their merits.

¶38 We agree with the State, at least in part. For reasons explained below, we hold that both the Welch claim and the 911 tapes claim are procedurally barred because they "could have been but [were] not raised at trial or on appeal." UTAH CODE § 78B-9-106(1)(c). We also conclude that Pinder has failed to properly invoke any of the so-called common law exceptions to the pre-2008 PCRA's procedural bar requirements under *Hurst v. Cook*, 777 P.2d 1029 (Utah 1989). And we therefore affirm without reaching the merits of Pinder's due process claims.

### 1. Procedural Bar

¶39 Because the State has invoked the procedural bar provisions of the PCRA, the burden to disprove the elements of procedural bar falls on Pinder. UTAH CODE § 78B-9-105(2). Thus, it falls

---

[10] *See also Taylor v. State*, 2012 UT 5, ¶ 26, 270 P.3d 471 ("[U]nder the PCRA . . . newly discovered evidence merits post-conviction relief only if the evidence would create a reasonable doubt as to the defendant's guilt." (internal quotation marks omitted)).

on Pinder to show that his due process claims are not ones that "could have been . . . raised at trial or on appeal." *Id.* § 78B-9-106(1)(c).

¶40 Pinder claims that he could not have raised the Welch claim or the 911 tapes claim previously—at trial, in time for his new trial motion, on a motion to amend his new trial motion (once he became aware of Welch's recantation and some problems with the tapes), or on his direct appeal. He advances two arguments in support of this assertion. First is the notion that the PCRA's procedural bar has no application to post-verdict proceedings prior to an appeal. Pinder claims to find that limitation in the text of Utah Code section 78B-9-106(1)(c)—in the terms limiting the procedural bar to claims that could have been raised "*at trial* or on appeal." Because a post-trial motion is not "at trial" in Pinder's view, he contends that a claim that could have been asserted (if at all) only *post*-trial is not subject to the statutory procedural bar.

¶41  This argument finds some plausible support in the terms of the statute. As Pinder indicates, we sometimes speak of a "trial" as a reference to the proceedings that begin with opening statements and end with a verdict. But that is not the only sense of this term. We may also speak of the "trial" proceedings as encompassing everything that happens *in the trial court*. And that is the sense of "at trial" in the PCRA.

¶42 We base that conclusion on the statutory context of the phrase "at trial"—on the fact that this phrase appears in a statute foreclosing claims that could have been asserted at earlier stages, and in a clause contrasting "at trial" with proceedings "on appeal." In this setting "at trial" cannot plausibly be understood to be limited to the proceeding beginning with opening statements and ending in a verdict. Such a construction would produce troubling loopholes in the PCRA's procedural bar provision—loopholes that would bar claims that could have been raised *before* the verdict or *during* the appeal, but not *before* opening statements (pre-trial) or *after* the verdict (post-trial). We see no rational way to attribute to the legislature the intent to condone such loopholes. And we accordingly construe section 104(e)'s reference to "trial"

to encompass all claims that could have been raised *in the trial court*.[11]

¶43 That brings us to Pinder's second basis for avoiding the PCRA's procedural bar—the argument that even if claims that could have been asserted at the post-trial stage are covered by statute, these claims are not barred because they came to light too late. In support of this argument, Pinder asserts that the evidence sustaining his due process claims came to light only after his new trial motion was filed, and after what he views as a limitation on *amendments* to new trial motions in the rules of criminal procedure. *See* UTAH R. CRIM. P. 24 (requiring new trial motion to be filed within 10 days of entry of sentence, without mentioning the possibility of an amendment). The parties devote substantial attention to this issue in their briefs, with Pinder relying on what he views as a negative inference from criminal rule 24, and the State asserting that civil rule 15 should be construed to apply in a criminal case (and to allow an amendment to a new trial motion). We need not and do not reach that question. We resolve the matter instead on the ground that Pinder's due process claims could have been raised at trial, or at least by the time he filed his new trial motion.

¶44 Our cases establish that a defendant "could have" raised a claim when he or his counsel is aware of the essential factual basis for asserting it.[12] And that conclusion holds even when the de-

---

[11] *See, e.g., State v. Barela*, 2015 UT 22, ¶¶ 42–44, 349 P.3d 676 (choosing a construction of statutory text on grounds that the alternative would produce anomalies that cannot be attributed to the legislature).

[12] *See, e.g., Taylor*, 2012 UT 5, ¶ 19 (finding procedural bar where the "facts underlying the[] claims arose" during earlier proceedings and were available to counsel for over twenty years); *Gardner v. State*, 2010 UT 46, ¶ 76, 234 P.3d 1115 (holding that due process claims "could have" been raised in a prior post-conviction proceeding and were thus procedurally barred because the petitioner "became aware" of the factual basis for his claims during the first post-conviction proceeding); *Gardner v. Galetka*, 2004 UT 42, ¶¶ 9–13, 94 P.3d 263 (holding that challenge to the knowledge element

fendant later discovers additional evidence providing further support for the claim.[13] The exception to this general rule is set forth by statute: "Notwithstanding Subsection (1)(c), a person may be eligible for relief on a basis that the ground could have been but was not raised at trial or on appeal, if the failure to raise that ground was due to ineffective assistance of counsel." UTAH CODE § 78B-9-106(3). Thus, the general rule is that the procedural bar applies to claims known to a defendant or his counsel; the exception kicks in when the failure to assert a known claim results from ineffective assistance of counsel.

¶45 We find Pinder's due process claims to be barred under these standards. The grounds for asserting claims regarding the Newly Welch testimony and the 911 tapes were known to Pinder at the time of trial, and accordingly "could have" been brought then or in his post-trial motion. At most Pinder has identified additional evidence supporting these claims, and that is insufficient to avoid the procedural bar under our cases.

### a. Newly Welch testimony

¶46 Pinder asserts that Welch perjured himself at trial and that the State knowingly presented that perjured testimony. He bases this claim—as well as his attempt to justify his failure to assert it sooner—on an affidavit of Todd Gabler, an investigator hired by Pinder's counsel. The Gabler affidavit asserts that on March 7, 2002, Welch recanted the essence of his testimony at trial—specifically, his assertion that Pinder had told Welch that he shot

---

of a jury instruction "could have" been brought on direct appeal or in a first post-conviction petition based merely on the "presence of the erroneous . . . instruction in the record").

[13] *See Taylor*, 2012 UT 5, ¶ 25 (although the petitioner discovered prosecutor's voir dire notes during federal habeas investigation leading him to raise claim that a juror was struck based on religious affiliation, claim could have been raised on direct appeal because trial counsel was present during voir dire "and knew that potential jurors were being questioned about their religious affiliation," "knew which jurors the prosecution removed with peremptory challenges," and should have been aware "that LDS members comprised approximately 78 percent of the jury pool").

and beat Tanner and Flood.[14] It also indicates that Welch told Gabler that he would not confess to his perjury at trial under oath until after his release from probation.

¶47 In light of this evidence, Pinder contends that he could not have raised a constitutional claim based on Welch's alleged perjury until *after* Welch got off probation. And because Welch's probation did not end until *after* Pinder filed his new trial motion, Pinder asserts that his due process claim regarding the knowing presentation of perjured testimony could not have been presented during the post-trial proceedings on that motion.

¶48 We disagree. Pinder's claim does not hinge on the Gabler affidavit. That affidavit may have provided some additional evidence in support of the claim that Welch perjured himself, but the defense had plenty of grounds for this assertion at trial, or in a post-trial motion.[15] And the affidavit says nothing about the key

---

[14] The State objects to the use of the Gabler affidavit as inadmissible hearsay, which cannot be used to establish a material issue of fact on summary judgment. That may be a winning argument. But it is one the State never raised below. It was accordingly forfeited. *See, e.g.*, *D & L Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989) (holding that "[i]t is true that inadmissible evidence cannot be considered in ruling on a motion for summary judgment," but rejecting an argument that summary judgment evidence contained hearsay because the party "failed to object at the trial court"); *see also id.* (collecting cases).

[15] The grounds for a charge of perjury by Welch at the time of trial were extensive: (1) that a fellow inmate testified that Welch told him that Welch was getting out of jail soon because he was going to testify against a "guy" facing murder charges, that Welch said he was going to testify that the "guy" confessed to him, and that the fellow inmate asked him if the confession had really occurred, and Welch shook his head, "no"; (2) that Welch admitted on cross-examination that he had made false statements to police about what Pinder said and that he hoped his testimony would help him get out of prison early; (3) that Welch told police that Pinder admitted using a sawed-off shotgun to commit the murders,  but a medical examiner testified that medium-caliber bullets

element of the State's *knowledge* of Welch's alleged perjury at the time of trial—as there is no indication that the State was aware of the contents of the Gabler affidavit at the time it presented the Welch testimony at trial.

¶49 We deem the Welch claim procedurally barred on this basis. The Gabler affidavit adds marginally to Pinder's assertion of perjury by Welch, but it is hardly necessary to the allegation of perjury. And, significantly, the affidavit says nothing about the State's knowledge of the alleged perjury. We therefore conclude that Pinder has failed to establish that the Welch claim is one not available at trial or at least on his post-trial motion.

¶50 Pinder has not sought refuge in the statutory exception to procedural bar; he has not asserted that the Welch claim was not raised at trial "due to ineffective assistance of counsel." UTAH CODE § 78B-9-106(3).[16] And absent such an argument, we find the Welch claim procedurally barred given that the essential basis of the claim was available to Pinder at trial or at least at the time of his post-trial motion.

### b. 911 tapes

¶51 Pinder's second due process claim fails on similar grounds. This claim is rooted in the allegation that the State knowingly presented doctored 911 tapes to establish that the crime in question was committed on Sunday, October 25, 1998. According to the ev-

---

(not shotgun pellets) were the cause of death; (4) that Welch admitted that he had access to the television while in jail and that he had seen a broadcast about Pinder two months before meeting him; and (5) that correctional officers testified that Pinder "pretty much kept to himself, kept in his room," making it unlikely that Pinder would confess to anyone, let alone "a manipulative inmate who always wanted attention and who lied to get what he needed."

[16] Indeed, Pinder's briefing on this appeal underscores the failure to allege ineffective assistance. Instead of establishing that he asserted such a claim, Pinder requests a remand to allow him to do so. There is no procedural mechanism for such a remand, however. And Pinder's failure to raise this claim only reinforces the propriety of the district court's decision below.

idence at trial, this was both the date of the murders *and* the date of the staged fight between Ruiz and Harris. Pinder claims that the State falsified the 911 tapes to change the *true date* of the fight (and hence the murders) from October 24, 1998, to October 25, 1998. The tapes themselves were never entered into evidence. But Pinder asserts that they were used to "refresh" the memories of various witnesses, including Pinder himself, so that they would testify to the "baseline" date of October 25. And Pinder claims that the date mattered because he had an alibi (through DeHart) on October 24.

¶52 On post-conviction review, Pinder presents the testimony of expert witnesses who analyzed the tapes from October 24 and 25. Those experts concluded that the recordings were "not pristine," and had in some unspecified way been "altered" and "tampered with by exporting and editing," and thus could not "be deemed reliable."

¶53 Pinder offers no clear ground for his assertion that this claim could not have been presented at trial or on a post-trial motion. When asked at oral argument to identify what alerted the defense team to the possibility of a problem with the date, counsel simply stated that at some point they decided that "the only way . . . [to] have a valid claim . . . was to see if there was an alteration of the tapes." That does not support the conclusion that this claim could not have been pursued sooner. Pinder has not identified any factual grounds for this claim that were not available at trial but only came to light more recently. He has merely asserted that counsel decided only at the post-conviction phase to pursue the matter further. That is insufficient. The same basis for the investigation by post-conviction counsel was as readily available to trial counsel. And that is enough to sustain the conclusion that the claim "could have" been brought at trial.

¶54 Pinder had ample grounds for pursuing an investigation into the date of the staged fight and subsequent 911 recording at the time of the trial. DeHart had testified to one date (October 24) in her obstruction of justice trial, but identified a different date (October 25) at Pinder's trial. And the difference in dates clearly mattered to Pinder at the time of trial—as he allegedly had an alibi for the former date but not the latter. Yet Pinder did not challenge the October 25 date at trial; nor did he pursue an investiga-

tion into the 911 tapes. He clearly could have done so then; he had every motivation and opportunity to do so at the time of trial or in anticipation of a post-trial motion.

¶55 This is accordingly a claim that "could have" been brought previously. Granted, the defense team did not have the results of the expert analysis during the trial and post-trial proceedings. But they had everything else, and the additional evidence provided by the expert's nebulous conclusions[17] is insufficient in this context to undermine the conclusion that this claim "could have" been brought earlier. As with the Welch claim, Pinder has not sought to avoid the procedural bar on the grounds spelled out in the PCRA—by asserting that the 911 tapes claim was not raised at trial "due to ineffective assistance of counsel." UTAH CODE § 78B-9-106(3). And absent such an argument, we find this claim procedurally barred given that the essential basis of the claim was available to Welch at trial or at least at the time of his post-trial motion.

## 2. Exceptions to Procedural Bar

¶56 Pinder also bears the burden of establishing the applicability of any exception to the procedural bar under *Hurst v. Cook*, 777 P.2d 1029 (Utah 1989). *Hurst* established common law "exceptions" to the limitations of the PCRA. Those exceptions, in turn, were repudiated by the legislature in 2008, in a provision clarifying that the PCRA is the "sole remedy" for post-conviction relief. UTAH CODE § 78B-9-102(1); *see also Taylor v. State*, 2012 UT 5, ¶ 11 n.3, 270 P.3d 471 (noting that Utah Code subsection 102(1) renders the *Hurst* exceptions inapplicable for all claims filed on or after May 5, 2008). Thus, the *Hurst* exceptions are available only for claims filed before May 5, 2008.

¶57 The *Hurst* exceptions are available to Pinder because his PCRA petition was filed on May 31, 2006. But Pinder has failed to carry his burden of establishing the applicability of any exception set forth in *Hurst*. His attempts to preserve the argument in the district court were minimal, and probably deficient, as he did little

---

[17] It is worth noting that Pinder's experts have not asserted that *the date* was altered in the 911 tapes. They state only that the recordings on both days had been altered in some fashion.

more than cite *Hurst*—with a vague reminder that the court "re-tain[ed] the right to address the merits of the claims if good cause exists."

¶58 But even if the issue was preserved in the district court, Pinder failed to carry his burden on appeal. His opening brief made no mention of the threshold burden under *Hurst*—of estab-lishing that the claims were "not withheld for tactical reasons." *Carter v. State*, 2012 UT 69, ¶ 25, 289 P.3d 542 (internal quotation marks omitted)). That alone is a fatal misstep, as we typically do not consider issues raised for the first time in a reply brief. *See Al-len v. Friel*, 2008 UT 56, ¶¶ 8, 16–18, 194 P.3d 903 (declining to ad-dress claim by PCRA petitioner raised for the first time in reply brief because such issues "are considered waived and will not be considered by the appellate court" (internal quotation marks omitted)).

¶59 Even assuming the viability of Pinder's argument on reply, however, he still has failed to carry his burden under *Hurst*. The reply brief says only that his due process claims could not have been withheld for tactical reasons because "the factual bas[e]s for the claims were not known either at trial or on appeal." That as-sertion fails on grounds set forth above. Because we have con-cluded that Pinder could have asserted his due process claims at trial (or on a post-trial motion), he has not carried his burden un-der *Hurst*.[18]

---

[18] As an alternative basis for its ruling, the district court reached the merits of both due process claims. Pinder claims that this was error. He bases that argument on the assertion that the State never moved for summary judgment on the merits of those claims, lim-iting its motion to procedural bar. Pinder is right that the State did not move for summary judgment on the merits of the 911 tapes claim. But the State *did* move on the merits of the claim regarding the Welch testimony—a point made clear by the fact that Pinder responded to the State's argument in his reply brief. It was ac-cordingly error for the district court to reach the merits of Pinder's 911 tapes claim. But since we affirm on the basis of procedural bar, the error was harmless.

## C. Discovery and Motion to Amend

¶60  Pinder also challenges the district court's (effective) denial of his motion for further discovery and the district court's denial of the motion to amend without explanation. The district court never expressly ruled on Pinder's motion for additional discovery. It effectively denied it by granting summary judgment in favor of the State. And though the district court did expressly rule on the motion to amend, it did so in a single line in its summary judgment order without articulating the basis for that decision.

¶61  We affirm. A denial of a motion to amend usually requires explanation. But we may affirm such a decision where the reasons for denial are apparent on the face of the record. *See Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 19, 243 P.3d 1275. That is the case here. Four years had passed between the time Pinder filed his petition in the district court and the filing of his motion to amend. The motion to amend, moreover, came a full year after the State filed its motion for summary judgment. Such eleventh-hour pleas to amend, filed on the eve of or during the pendency of a summary judgment motion, are often denied as untimely.[19] Pinder had plenty of time to discover the facts purportedly meriting an amendment. The district court's decision to deny Pinder's motion—and instead to grant a summary judgment motion that had been pending for over a year—was not an abuse of discretion.

---

[19] *See, e.g.*, *Roberts v. Ariz. Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (no abuse of discretion when motion to amend "raised at the eleventh hour, after discovery was virtually complete" and a motion for summary judgment "was pending before the court"); *Neztsosie v. Meyer*, 883 P.2d 920, 922 (Utah 1994) (no abuse of discretion in denying motion to amend that came three years after filing of complaint, and a month after grant of summary judgment); *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶¶ 29, 30, 87 P.3d 734 ("[M]otions to amend are typically deemed untimely when they are filed in the advanced procedural stages of the litigation process . . . . [And] regardless of the procedural posture of the case, motions to amend have typically been deemed untimely when they were filed several years into the litigation." (collecting cases)).

¶62 The district court also acted within its discretion in denying Pinder's discovery motion. First, Pinder never properly submitted the motion for decision under Utah Rule of Civil Procedure 7. *See* UTAH R. CIV. P. 7(d) ("If no party files a request [to submit for decision], the motion will not be submitted for decision."). Second, Pinder's decision to seek additional discovery did not invoke rule 56(f), as required, in seeking a continuance. *See* UTAH R. CIV. P. 56(f) (recognizing court's discretion to deny motion for summary judgment if it "appear[s] from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition"). And even if he had, the district court would have been within its discretion to deny such a motion as dilatory. As with the motion to amend, the motion for additional discovery came after years of litigation and after the filing (and one year pendency) of a dispositive motion for summary judgment. Thus, we see no abuse of discretion in the district court's denial of Pinder's motion for additional discovery.

_____