**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SIDNEY SOREN SCOTT,

      Petitioner - Appellant - Cross-
      Appellee,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee - Cross-
      Appellant.

Nos. 00-7103, 00-7106

---

**Appeal from the United States District Court**
**for the E. District of Oklahoma**
**(D.C. No. CIV-97-475-S)**

---

Randy A. Bauman, Assistant Federal Public Defender, Oklahoma City, Oklahoma,
for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General, (W. A. Drew Edmondson,
Attorney General of Oklahoma, with him on the brief), Oklahoma City,
Oklahoma, for Respondent-Appellee.

---

Before **SEYMOUR**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Sidney Soren Scott, an Oklahoma state prisoner, appeals the denial, in part, of his petition for habeas corpus relief pursuant to 28 U.S.C. § 2254.  Scott was convicted of first-degree murder and sentenced to death after the jury found the existence of two aggravating circumstances—that the murder was committed to avoid arrest and that Scott was a continuing threat to society.  The district court denied habeas relief on fifteen grounds, but granted relief upon concluding that Morgan v. Illinois, 504 U.S. 719 (1992), was violated during voir dire.  Scott raises seven claims of error on appeal, and the State of Oklahoma in turn challenges the district court's grant of habeas relief based on Morgan.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's grant of habeas relief on the alternate ground that the prosecution suppressed material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Because we affirm the grant of relief based on Scott's Brady claim, we do not address the Morgan claim.

**I**

On February 16, 1990, Henry A. Mattocks was found dead with his throat cut.  His partially burned pickup truck was found east of where his body was discovered.  Evidence presented at trial revealed that Neal Rinker, Ramona Rinker, Janie Bishop, Edwin Monks, Dean Monks, Ronald "Pete" Seymour, Keith Boggs, and Scott had a party at the Brooken Cove Motel in Enterprise, Oklahoma,

where they consumed tequila and two or three cases of beer during the evening of February 15, 1990, and the early morning hours of February 16, 1990. After arriving at the Brooken Cove Motel, the group walked to Jack's Lounge, located across the parking lot from the motel, where they met Mattocks. Neal Rinker testified that Scott told him that he needed about $150 to pay a citation and that he planned on taking the money from Mattocks. After the lounge closed, the group moved the party back to the motel. Mattocks was on his way home when he discovered he had a flat tire. He approached the group in their motel room to ask for assistance and socialized with them after the tire was changed.

Scott left the motel room after apologizing for an argument he previously had with Bishop, stating that he had found a ride and that no one should worry about him getting home. Remaining members of the group left the room around 2:00 a.m. and drove to Monks's mother's house in Stigler, Oklahoma, arriving between 4:00 and 4:30 in the morning—after taking an indirect route that would have taken them in the direction of the homicide scene.

Two witnesses testified that they saw Scott walking along the highway between Quinton, Oklahoma, and Enterprise, just north of Quinton around 6:30 or 7:00 on the morning of February 16, 1990. One of the witnesses testified that she did not see any stains or spots on Scott's clothing and that she would have noticed if there had been any.

- 3 -

Several individuals present at the motel on February 15, 1990, testified that Scott later made inculpatory statements to them concerning the murder. Neal Rinker testified that Scott told him that he killed Mattocks. He stated that Scott said that he had an altercation with Mattocks that began as a wrestling match, but that he then cut Mattocks's throat, left him "lying dead," and took eleven dollars from his wallet. (Tr. at 420.) Rinker also testified that Scott mentioned that he had burned Mattocks's truck. Bishop said that she heard Scott say something about the homicide both at Monks's house and while a small group was walking to Ramona Rinker's grandmother's house. Ramona Rinker testified that she heard Scott tell Bishop that there was no way Mattocks could be alive because he had cut him "from jugular to jugular." (Id. at 512.)

Finally, Monks testified that Scott confessed to him and that Scott tried to get Monks to provide an alibi for him. When Monks refused, Scott held up a knife and asked if someone would get rid of it for him. Monks said he would and Boggs drove Monks and Bishop to a coal strip pit north of Stigler where Monks threw the knife in the pit. Law enforcement officers found the knife in the strip pit based on information provided by Monks.

Scott was found guilty of first degree murder. During the sentencing stage of the trial, Neal Rinker again testified on the State's behalf. Rinker's testimony was instrumental in supporting the continuing threat aggravator. He stated that

Scott told him that the murder did not bother him "because it wasn't his first time" and that Scott often told people that Mattocks's murder was not his first. (Tr. at 763, 782.)  In addition, Ramona Rinker testified that Scott sent her an envelope from jail with three letters, one for herself, one for Neal Rinker, and one for Bishop.  Bishop stated the letter she received from Scott was "[a] letter threatening my life." (Id. at 807.)

Scott was sentenced to death after the jury found the existence of two aggravating factors—that he committed murder to avoid arrest and that he was a continuing threat to society.  On direct appeal the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Scott's conviction and sentence, Scott v. State, 891 P.2d 1283 (Okla. Crim. App. 1995), and the Supreme Court denied certiorari, Scott v. Oklahoma, 516 U.S. 1077 (1996).  Scott's application for post-conviction relief was also denied by the OCCA.  Scott v. State, 942 P.2d 755 (Okla. Crim. App. 1997).  Scott subsequently filed a petition for a writ of habeas corpus, which the district court granted based on the trial court's failure to determine whether the jurors that sentenced Scott to death were qualified to consider life imprisonment and life imprisonment without parole as appropriate punishments for a first degree murder conviction, as required by Morgan v. Illinois, 504 U.S. 719, 733–34 (1992).  Arguing that the Morgan claim is unexhausted and is procedurally barred, the State has challenged this grant of habeas relief.  Scott

contends the district court erred in denying relief on five claims: that the prosecution suppressed material evidence in violation of Brady; that his right to confront a state witness was violated when the trial court prohibited two lines of cross-examination; that the trial court's determination of his competency was made under an unconstitutional standard; that his trial counsel was ineffective in failing to conduct adequate investigation, failing to obtain a mental health expert, and failing to obtain an alcohol intoxication expert; and that his appellate counsel was ineffective in failing to raise the Brady and ineffective assistance of trial counsel claims. Because Scott filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this appeal is governed by the Act's provisions. Under AEDPA, we review those claims that were adjudicated on the merits by the Oklahoma courts to determine whether the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## II

Scott contends that the prosecution concealed material evidence of another individual's confession to the Mattocks murder in violation of Brady, and that this

violation of his due process rights entitles him to a new trial.

A letter written by Rinker to Douglas Fitzgerald is the first piece of potentially exculpatory evidence withheld from Scott. Scott's attorneys did not become aware of its existence until after the trial ended. March 9, 1990, is the date on the letter, which was just after the murder of Mattocks on February 16, 1990, and months before the trial. Rinker wrote the following:

> I just read your letter and I don't fucking like it. You write about <u>Andrea only</u>. Ramona is my wife and always will be so face it. Doug I'm not the kid you used to know. I'll kill some-body deader than hell over my family. So don't try taking it, all you have to do is write some-one here they'll tell you how I am now you could asked some-one else but as you have already heard he got his throat cut and his head detached.

(Initial Applic. Post-Conviction Relief ("Applic.") App. 2 Ex. A at 2.) In April 1990 the lead prosecutor received this letter from a state investigator. The prosecutor admits that he did not notify Scott's counsel of its existence until after Scott was convicted of murder and sentenced to death. (See M. New Trial Tr. at 71–73.) Once Scott learned of the letter, he moved for a new trial, characterizing the contents as a confession by Rinker to the murder of Mattocks. That motion was denied because the trial judge was "not sure that that letter would have done anything other than to possibly impeach or aid in impeaching Rinker's testimony; I don't think it would make that much difference." (Id. at 88.)

J.C. Marshall's statements are the second piece of potentially exculpatory

evidence withheld from Scott. Marshall had spoken to police investigators prior to Scott's trial concerning statements that Rinker had made about the Mattocks murder. This evidence was discovered by Scott's appellate counsel while preparing Scott's application for post-conviction relief. Marshall, who was working at the home of Rinker's mother fixing one of her cars, told investigators first that he had overheard Rinker confess to his mother that he had murdered Mattocks, and second that Rinker had repeated the confession directly to him. In an affidavit filed with the application for post-conviction relief, Marshall stated:

> 1. Following the death of Henry Mattocks and prior to the trial of Sidney Scott I walked in on a conversation between Charlotte Rinker and her son Neal Rinker at Charlotte's house. This was shortly after Sidney Scott was arrested.
>
> 2. I was over at Charlotte (McCoy) Rinker's house working on one of her cars. I went into the house to get a cup of coffee. As I walked through the back door of the house, I heard Neal Rinker say that he had killed the old man. Charlotte asked him if it was true and he said "yes, I killed him." I asked what he was talking about. Neal said "didn't you know they got Sid for killing that old man? It wasn't Sid, it was me." Neal said he cut the old man's throat.

(Applic. App. 2 Ex. B at 1.) Before Scott's trial, police investigators spoke with Marshall, and he told them about his conversation with Rinker. According to Marshall's affidavit, however, the investigators told him "because it was hearsay I didn't have the right to say anything. They said that they would not need me at trial. I never heard anything more from them." (Id.) Shelly Marshall, Marshall's wife at the time of these events, was present during this conversation with the

-8-

police investigators and submitted an affidavit corroborating Marshall's account of the conversation.

Scott also notes a third situation involving an alleged confession by Rinker. According to an affidavit submitted by Carl McConnell, Ramona Rinker told McConnell that Neal Rinker "wrote her a letter from prison admitting he had cut Henry Mattock's [sic] throat." (Applic. App. 2 Ex. Q at 1.) Scott does not contend that this statement, reputedly made post-trial, was ever in the possession of prosecutors or improperly withheld from him. Therefore, this alleged confession will not be considered in our Brady analysis.

## A

Scott raised his Brady claims during the Oklahoma post-conviction proceedings, and the OCCA deemed them procedurally barred. Scott, 942 P.2d at 758–59. Under Oklahoma's post-conviction procedure act, for each of Scott's Brady claims, he had to demonstrate (1) that the claim was not and could not have been raised on direct appeal and (2) that the claim supports a conclusion that either the outcome of the trial would have been different but for the errors or that the defendant is factually innocent. Okla. Stat. tit. 22, § 1089(C). Because Rinker's March 9 letter was the subject of a motion for a new trial, the OCCA concluded that Scott waived the Brady claim based on this evidence because the trial court's ruling was not appealed. Scott, 942 P.2d at 758. In reviewing the

Brady claim based on the Marshall evidence, the OCCA stated that it was "unable to conclude that this claim could not have been raised on direct appeal" and moreover that it could not "conclude that this claim would have changed the outcome of the trial or that it supports a claim that Scott is factually innocent." Id. at 758–59.[1]

Because the OCCA decided that Scott defaulted his Brady claims by failing to raise them on direct appeal, the State contends that this is an adequate and independent state procedural ground for denying Scott relief. We are precluded, under Coleman v. Thompson, from reviewing procedurally defaulted claims unless "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." 501 U.S. 722, 750 (1991). Scott responds that he can establish cause to excuse this default based on the State's concealment of the Brady evidence and ineffective assistance of appellate counsel.

---

[1] The OCCA's procedural-bar determination that disclosure of the Marshall evidence would not have changed the outcome of Scott's trial is not a determination on the merits of Scott's Brady claim. The standard applied by the OCCA—whether "the outcome of the trial would have been different," Scott, 942 P.2d at 758 (emphasis added)—is more stringent than Brady's materiality test, which, as stated below, requires only a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," United States v. Bagley, 473 U.S. 667, 682 (1985) (emphasis added).

-10-

Cause for a procedural default can exist when "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Such an external factor might, for example, be proven by "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that some interference by officials made compliance impracticable." Id. (quotations omitted). Scott contends that his appellate counsel was unable to comply with the procedural rules of the OCCA because the State suppressed the Marshall evidence.[2] In examining whether there is cause to excuse Scott's failure to raise this claim on direct appeal, we must evaluate counsel's actions in light of the information counsel had, or reasonably could have had, at the time of the direct appeal.

In Strickler v. Greene, the Court noted that "[i]n the context of a Brady claim, a defendant cannot conduct the 'reasonable and diligent investigation' mandated by [McCleskey v. Zant, 499 U.S. 467 (1991),] to preclude a finding of procedural default when the evidence is in the hands of the State." 527 U.S. 263, 287–88 (1999). As the Court explained in Amadeo v. Zant,

---

[2] One of the prosecution's duties is to disclose exculpatory evidence to the defense even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), reversed on other grounds by United States v. Bagley, 473 U.S. 667, 682 (1985), and this duty encompasses impeachment evidence, Bagley, 473 U.S. at 676.

If [material evidence] was not reasonably discoverable because it was concealed by [government] officials, and if that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to raise the jury challenge in the trial court, then petitioner establishes ample cause to excuse his procedural default under this Court's precedents.

486 U.S. 214, 222 (1988).

There is no evidence that Scott was aware of the existence of the Marshall evidence at the time of his direct appeal; at that time he was only aware of the Rinker letter. Scott, of course, had no reason to believe that the State was concealing additional potentially exculpatory evidence. See Strickler, 527 U.S. at 286 ("Mere speculation that some exculpatory material may have been withheld . . . [should not] impose a duty on counsel to advance a claim for which they have no evidentiary support."). Simply stated, appellate counsel could not have raised the Brady claim based on the Marshall evidence during direct appeal because she was unaware of it due to the State's concealment.[3]

There are two factual bases underlying the Brady claims: the first is Rinker's March 9 letter, and the second is the Marshall evidence. Appellate

_____

[3] Although the Supreme Court in Strickler specifically did not address "the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, or could reasonably discover, how to obtain them" because that issue was not before the Court, 527 U.S. at 288 n.33, we do not have to address this issue because Scott was not aware that the Marshall evidence existed until he and his counsel were preparing his petition for post-conviction relief.

-12-

counsel was aware of the letter evidence but did not pursue it on appeal. Counsel could have made a reasonable tactical decision not to pursue this claim on appeal because the letter did not directly tie Rinker to Mattocks's murder and it is questionable whether, on its own, the letter would satisfy the Brady materiality requirement. Counsel could not, however, have made a tactical decision not to pursue a Brady claim based on the Marshall evidence because she was unaware of it. This evidence is much stronger than the March 9 letter because it specifically mentions facts that enable one to conclude that Rinker explicitly confessed to the murder of Mattocks. As noted earlier, Marshall informed state investigators that he overheard Rinker tell his mother that he had killed Mattocks by slicing his throat, and that Rinker then confessed the same information to Marshall himself, with Rinker noting that law enforcement officials "got" Scott for the crime. (Applic. App. 2 Ex. B at 1.)

Scott's Brady claim based on the Marshall evidence was determined to be procedurally defaulted by the OCCA because it found that the claim could have been raised on direct appeal. This conclusion is based on a factual determination. Pursuant to 28 U.S.C. § 2254(e)(1) this fact is "presumed to be correct" and Scott has "the burden of rebutting the presumption of correctness by clear and convincing evidence."

-13-

There can be no dispute that the OCCA was presented with the factual argument underlying Scott's <u>Brady</u> claims. In his application for post-conviction relief, Scott stated that the State withheld two pieces of exculpatory evidence in violation of <u>Brady</u>—the Rinker letter and the Marshall evidence. Scott noted that the claim, "as it was available on direct appeal, has now been further bolstered by discovery of [a] second withheld confession of the same State's witness." (Applic. App. 1 at 25 n.7.) He informed the OCCA that the Marshall evidence had not been supplied to the defense and had been "discovered only recently in the course of the post-conviction investigation." (<u>Id.</u> at 7.)

Without knowledge of the Marshall evidence, Scott could not argue on direct appeal that the prosecution impermissibly suppressed it. It is not a petitioner's responsibility to uncover suppressed evidence. <u>Cf.</u> <u>United States v. Quintanilla</u>, 193 F.3d 1139, 1149 (10th Cir. 1999) (noting that defense counsel's knowledge of exculpatory evidence is only relevant in determining materiality because "whether a defendant knew or should have known of the existence of exculpatory evidence is irrelevant to the prosecution's obligation to disclose the information" (citing <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1517 (10th Cir. 1995))). Despite knowledge of these facts, the OCCA did not state how Scott could have raised this claim earlier. Because the State concealed this evidence, Scott was prevented from making the <u>Brady</u> claim on appeal, and we conclude that Scott has

rebutted the presumption that he could have raised his <u>Brady</u> claim based on the

Marshall evidence on direct appeal.[4]

The State's failure to disclose the information constitutes cause to excuse

Scott's procedural default because the State's concealment of the evidence is an

---

[4] Although it is possible to see Scott's <u>Brady</u> claims as being predicated upon one factual basis—Rinker's confession—such a conception would lead, in some circumstances, to an untenable result. If appellate counsel is faced with a weak <u>Brady</u> claim and does not raise it on direct appeal, counsel will most likely not be deemed ineffective for having chosen to focus on arguments that are more likely to prevail. As we explained in <u>United States v. Cook</u>:

> The Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal. Consequently, appellate counsel engage in a process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail. The weeding out of weak claims to be raised on appeal is the hallmark of effective advocacy, because every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court.

45 F.3d 388, 394–95 (10th Cir. 1995) (quotations and citations omitted). An appellate counsel's decision to raise particular claims on appeal is based on evaluating the strength of those arguments in light of the available facts and law. If additional, stronger <u>Brady</u> evidence subsequently emerges, counsel's initial calculus for deciding what claims to raise on appeal would presumably have been altered. If we were to treat this later <u>Brady</u> evidence as subject to the same procedural default as the weaker evidence, we would only be encouraging counsel to protect against such a potentiality by continuing to press weak claims in all circumstances. We will not require counsel to raise borderline claims on appeal in order to prevent a procedural default of a subsequent claim based on related, but previously unavailable, evidence.

The OCCA reasonably analyzed the two evidentiary bases for this claim separately, and we likewise conclude that each piece of concealed evidence constitutes a separate basis for a <u>Brady</u> violation.

"objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." Murray, 477 U.S. at 488. For the reasons discussed below, we conclude that the Marshall statements constitute Brady evidence that the prosecution had a duty to disclose to Scott. Therefore Scott has also established prejudice to overcome his procedural default.

**B**

To establish a Brady violation, Scott must demonstrate that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." Banks, 54 F.3d at 1516. Scott satisfies the first prong of this test because the State does not refute that the Marshall evidence was known by police investigators—and by inference the prosecution, see Kyles v. Whitley, 514 U.S. 419, 437–38 (1995)—before Scott's trial but was nevertheless not given to Scott. Scott also meets the second Brady prong because an alleged confession by an individual other than Scott is undeniably "favorable" to Scott. In order for the Marshall affidavit to be material, there must be a reasonable probability that, "had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)); see also Banks, 54 F.3d at

-16-

1518. A showing of materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." Kyles, 514 U.S. at 434; cf. Williams v. Taylor, 529 U.S. 362, 406 (2000) (noting, in the context of an ineffective assistance of counsel claim, that to require a prisoner to show by a preponderance of the evidence that the result of his criminal proceedings would have been different would be "diametrically different, opposite in character or nature, and mutually opposed to our clearly established precedent . . . that the prisoner need only demonstrate a reasonable probability that . . . the result of the proceeding would have been different" (quotations omitted)).

Based on its reading of Oklahoma law, the district court concluded that the suppressed evidence at issue is hearsay and would have been admissible only for impeachment purposes and not as substantive evidence. Although Rinker's statement was one against penal interest, such a statement is only an exception to the hearsay rule under Oklahoma rules if the declarant, Rinker, was unavailable at the time of trial. See Okla. Stat. tit. 12, § 2804(B)(3); Cooper v. State, 671 P.2d 1168, 1173 (Okla. Crim. App. 1983). Under Oklahoma law a witness is unavailable if he invokes his constitutional privilege against self-incrimination

and refuses to testify, Funkhouser v. State, 734 P.2d 815 (Okla. Crim. App. 1987), refuses to testify concerning the subject matter despite a court order to do so, testifies to a lack of memory regarding the subject matter, or is not present to testify. See Okla. Stat. tit. 12, § 2804(A). Scott argues that the Marshall evidence could have been admitted as substantive evidence if, when confronted with the evidence, Rinker admitted he confessed or took the Fifth Amendment and refused to answer. Had Rinker denied making the alleged confession, the Marshall evidence would have been admissible only for impeachment purposes.

Whether the evidence would have been admissible as substantive[5] or impeachment evidence does not alter our conclusion that the evidence is subject to disclosure under Brady. Even assuming the evidence is only admissible as impeachment evidence, the Supreme Court has held that such evidence is subject

---

[5] Addressing the importance of third-party confessions in murder cases, Justice Holmes dissented from the Court's affirmance of a trial court's decision to exclude a third party's confession to a murder in Donnelly v. United States, 228 U.S. 243 (1912). He noted that "no other statement is so much against interest as a confession of murder." Id. at 278 (Holmes, J., dissenting). Later the Court adopted Justice Holmes's view in Chambers v. Mississippi, stating that the mechanical application of hearsay rules can "defeat the ends of justice" because constitutional rights are directly affected and "the ascertainment of guilt [is] implicated." 410 U.S. 284, 302 (1973). Rinker's confessions to his mother and Marshall were made a short time after Mattocks was murdered, the confessions were "self-incriminatory and unquestionably against interest," and because Rinker testified at the trial he was present "if there was any question about the truthfulness of the extrajudicial statements." Id. at 300–01; see also Green v. Georgia, 442 U.S. 95, 97 (1979). Therefore it is possible that the Marshall evidence could have been admitted as substantive evidence.

-18-

to disclosure under <u>Brady</u>:  "[W]hen 'the reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of <u>Brady</u>]."  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (quoting <u>Napue v. Illinois</u>, 317 U.S. 264, 269 (1959)).  Nonetheless, impeachment <u>Brady</u> material will only require a new trial "if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  <u>Id.</u> (quotation omitted).

Scott contends that impeaching Rinker with Marshall's testimony would not only have undermined Rinker's credibility, but also that of Monks, Bishop, and Ramona Rinker:  "If the jury had disbelieved Rinker, they would have inevitably discounted the 'party line' espoused by the witnesses associated with Rinker . . . .  Jurors could readily have believed the State's witnesses associated with Rinker were protecting him at Mr. Scott's expense."  (Appellant's Br. at 22.)  Based on the testimony presented at trial, Rinker, Monks, Bishop, and Ramona Rinker were together from the time that Scott left the motel room in Enterprise to the time that Scott returned to Monks's home the following day, where he allegedly confessed to killing Mattocks.  Impeaching Rinker's testimony could reasonably call into question the credibility of Monks, Bishop, and Ramona Rinker because their interests were bound together due to their testimony that they were together at the time Mattocks was killed and at the time Scott confessed.

-19-

When analyzing a Brady claim, we do not "reweigh evidence, assess the credibility of witnesses, and decide whether the [suppressed evidence] establishes the guilt of [a third party] beyond a reasonable doubt or exonerates [petitioner]." Banks, 54 F.3d at 1521. We also do not determine "whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." Kyles, 514 U.S. at 453. In this case our confidence in the jury's verdict is undermined by the prosecution's failure to provide Scott with the Marshall evidence. There is a reasonable probability that the outcome of the trial would have been different had the prosecution provided Scott with the evidence that Rinker allegedly confessed to killing Mattocks. This evidence could have been used to impeach Rinker, and it also could have cast serious doubt on the testimony of Monks, Bishop, and Ramona Rinker.

Having determined that Scott has shown cause and prejudice to excuse the procedural bar with respect to the Brady claim based on the suppressed Marshall evidence, and having concluded that the Marshall evidence is both exculpatory and material, we grant Scott habeas relief on this claim.

### III

We **GRANT** Scott habeas corpus relief based on a violation of Brady and order a new trial. Because of our grant of habeas relief on this claim, we decline

-20-

to address the remaining claims of error.