**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOHN R. PINDER,

     Petitioner - Appellant,

v.

SCOTT CROWTHER,

     Respondent - Appellee.

No. 19-4039
(D.C. No. 2:16-CV-00189-DN)
(D. Utah)

_____

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]
_____

Before **HARTZ**, **HOLMES**, and **MORITZ**, Circuit Judges.
_____

John R. Pinder, a Utah state prisoner, seeks a certificate of appealability (COA) to

challenge the district court's denial of four grounds for relief set forth in his 28 U.S.C.

§ 2254 habeas petition. We deny a COA and dismiss this matter.

I. **Background**

We take the following factual recitation from the opinion of the Utah Supreme

Court (USC) affirming the denial of Mr. Pinder's petition for post-conviction relief,

which, as the USC noted, "is presented in a light favorable to the prosecution, and

_____

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

consistent with the judgment of conviction," *Pinder v. State*, 367 P.3d 968, 969 n.1 (Utah

2015) (*Pinder II*):

> John Pinder owned a sprawling ostrich ranch in Duchesne County. He and his ranch-hand, Filomeno Ruiz, were accused (and ultimately convicted) of murdering June Flood and Rex Tanner. Flood and Tanner also worked on Pinder's ranch.
>
> According to the evidence at trial, Ruiz staged a fight with his girlfriend, Mandy Harris, on the day of the alleged murder[1]. The purpose of the staged fight was to get Harris away from the ranch. Ruiz called 911 during this staged altercation. Harris left after the police showed up. And the 911 call was recorded by the local dispatch.
>
> That evening, Pinder, his girlfriend Barbara DeHart, Ruiz, and Pinder's employees Joe Wallen and David Brunyer (along with Brunyer's wife) gathered around a campfire to drink. At some point the conversation turned to the "shrunken heads" that Pinder and DeHart had seen at a curiosity shop in Seattle. Eventually Pinder spoke of his hopes to someday acquire one. Pinder said to Ruiz, "let's go get some heads." Ruiz responded with a question: "four or two?" Pinder replied, "two."
>
> After grabbing a baseball bat, Pinder and Ruiz drove to the home where Flood and Tanner resided. Pinder violently assaulted Flood and Tanner, kidnapped them, and then shot them both with a 10 mm pistol. Pinder and Ruiz then left the murder scene and later returned with ammonium nitrate and dynamite, packed the bodies with the explosives, and set them off.
>
> Pinder later got others to help him hide the remains. Following a day of bulldozing the blast site, Pinder and Ruiz dropped several black garbage bags of body parts into a barrel and set them ablaze. Pinder, DeHart, and Ruiz then met with the Brunyers for dinner, after which Pinder and Ruiz returned to the lake to collect more parts for burning.
>
> Tuesday morning, at Pinder's behest, Ruiz and Brunyer went to the Flood home armed with a bottle of alcohol and some rags to remove fingerprints and tidy up. After returning, Brunyer complained about the smell of the Flood residence, to which Pinder quipped, "That's because Tanner shit his pants when I shot him." Pinder, Ruiz, and Brunyer then spent the day bulldozing and gathering more body parts for disposal. After

---

[1] Whether the murders were committed on Saturday, October 24, 1998, or Sunday, October 25, 1998, is at issue in one of the grounds on which Mr. Pinder seeks a COA.

coming across Tanner's wrist watch, Pinder callously joked that it must have been a Timex, because "it was still ticking." Eventually the bulldozer ran out of gas. And when they went to get more, Brunyer asked Pinder why he killed Flood and Tanner, to which Pinder replied, "They were liars, thieves and maggots, and now they're vaporized no one will miss them anyway." Upon arriving home that evening, Brunyer's daughter could see he was upset. He recounted the gruesome tale to his daughter. She took notes and then taped them to the inside of her dresser drawer after having Brunyer read over and approve them.

By Thursday, October 29th, Pinder and DeHart had left the state, eventually arriving in Cataldo, Idaho. That Sunday, DeHart contacted her daughter Melissa Cowles and told her that over the last couple of days Pinder "had admitted to killing some people on the ranch"; that they had been "cleaning up the evidence"; that she had found "a bag of what looked like bloody hair and scalp" in Pinder's truck, which she then threw away; and that they had "thrown the murder weapon off a bridge and into the river." DeHart had said they were "like Bonnie and Clyde, always on the run." That same day DeHart called her father, Bernie Knapp, and told him "she helped clean blood and mess out of John Pinder's truck," that "they had some bloody clothing and items in bags that they had tossed in dumpsters in little towns on the way up on their trip," and that they "either had gotten rid of a gun or were in the process of getting rid of a gun."

Meanwhile, back at the ranch, an investigation was underway. One of Flood's friends reported her missing, and police officers searched the Flood residence. Police discovered the home in utter disarray, with blood on the bed sheets and the backrest of a chair in the living room. They also found a pair of excrement-stained pants in the bathroom. After leaving the home, the investigating officer saw and approached Brunyer, who was standing nearby. Brunyer appeared "very agitated, very nervous, and scared to death," but handed the officer the letter his daughter had written and the bottle of alcohol with which he had assisted in cleaning up the home.

Pinder and DeHart arrived back in Salt Lake on November 4th. On that day they decided to appear on KSL News for a television interview about the murders. Shortly thereafter, Pinder, Ruiz, and DeHart were all arrested. Investigators later searched Pinder's ranch and found a gruesome assortment of the victims' remains strewn about the area, stuck in bushes, and hanging from trees. They also searched Pinder's truck and found a 10 mm shell casing, one of the victim's thumbprints on the inside of a window, and some bloodstains (one identified as Pinder's, the other

unidentified). Police also determined that the rear windows had been wiped down and cleaned, as well as the mid-section of the door jam.

Ruiz pled guilty to two counts of murder. He denied being the shooter, accusing Pinder instead. DeHart was charged with and later convicted of obstruction of justice. *State v. DeHart*, 2001 UT App 12, 17 P.3d 1171. And Pinder was charged with two counts of aggravated murder, two counts of aggravated kidnapping, two counts of tampering with evidence, one count of burglary of a dwelling, one count of possession of explosives, and two counts of desecration of a body.

While being held in the Summit County Jail before his preliminary hearing, Pinder met an inmate named Newly [sic[2]] Welch. Pinder bragged to Welch about killing Tanner and Flood and blowing up their bodies. He told Welch that the day of the murders, he and Ruiz staged a fight with Ruiz's girlfriend to get her off of the ranch. Welch then asked Pinder what it was like to kill someone. And in response, Pinder put his hand on Welch's shoulder and said, "There's no bigger rush, especially when you know you're going to get away with it." Pinder was convicted on all counts and sentenced to life with the possibility of parole on the aggravated murder charges, and to consecutive statutory terms on the other counts.

*Pinder II*, 367 P.3d at 969-71 (paragraph numbers, footnote, brackets, and ellipses omitted).

After his convictions, Mr. Pinder filed a motion for a new trial. The trial court denied the motion, and the USC affirmed, *see State v. Pinder*, 114 P.3d 551 (Utah 2005) (*Pinder I*). As noted, the USC later affirmed the denial of Mr. Pinder's petition for post-conviction relief (PPCR).

Mr. Pinder then filed a petition for habeas corpus in federal district court pursuant to 28 U.S.C. § 2254. The district court denied relief on all seven grounds and denied a COA. In this court, Mr. Pinder has filed a Combined Opening Brief and Application for a Certificate of Appealability (COA Application), seeking a COA on four grounds, some

---

[2] At trial, Mr. Welch spelled his first name "Newley."

4

of which the district court denied for procedural reasons and others the court denied on the merits.

## II. **Standard of review**

To appeal the denial of a § 2254 petition, a petitioner must first obtain a COA. *See* 28 U.S.C. § 2253(c)(1)(A). To obtain a COA on claims the district court denied on the merits, a petitioner must make "a substantial showing of the denial of a constitutional right," § 2253(c)(2), such "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). For claims the district court denied on a procedural ground without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and . . . whether the district court was correct in its procedural ruling." *Id.* "Each component of [this] showing is part of a threshold inquiry." *Id.* at 485. Thus, if a petitioner cannot make a showing on the procedural issue, we need not address the constitutional component. *See id.* "The COA inquiry . . . is not coextensive with a merits analysis," *Buck v. Davis*, 137 S. Ct. 759, 773 (2017), and is limited to "an overview of the claims in the habeas petition and a general assessment of their merits," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Because Mr. Pinder filed his § 2254 petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it is governed by AEDPA's provisions. *See Wallace v. Ward*, 191 F.3d 1235, 1240 (10th Cir. 1999).

5

Under AEDPA, our consideration of Mr. Pinder's request for a COA must incorporate "AEDPA's deferential treatment of state court decisions." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004). We therefore "look to the District Court's application of AEDPA to [Mr. Pinder's] constitutional claims and ask whether that resolution was debatable among jurists of reason." *Miller-El*, 537 U.S. at 336. To that end, we must keep in mind that when a state court has adjudicated the merits of a claim, a federal court may grant habeas relief only if that state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). But AEDPA's deferential standards of review do not apply if a "state court employed the wrong legal standard in deciding the merits of [a] federal issue." *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003). In that case, rather than deferring to the state court's resolution of the issue, a federal court reviews the issue de novo to determine whether habeas relief is warranted. *Milton v. Miller*, 744 F.3d 660, 670–71 (10th Cir. 2014).

## III. **Discussion**

### A. **Grounds one and two**

Grounds one and two of Mr. Pinder's § 2254 petition concern due-process claims he advanced in his PPCR. In ground one, Mr. Pinder claimed the State used doctored 911 tapes of the calls regarding the fight between Mr. Ruiz and his girlfriend that changed the date of the calls from October 24 to October 25, 1998. The State did not

6

introduce the audio from the tape at trial, but the log of the 911 calls established a baseline date of October 25 for the fight and the murders.[3]  Various witnesses, including Mr. Pinder and his girlfriend, Ms. DeHart—who had earlier testified in her obstruction trial that the fight occurred on October 24—then keyed their testimony to that baseline date.  Mr. Pinder claimed the date mattered because he had an alibi for October 24—he was at home on the ranch with Ms. DeHart.  He presented affidavits from experts that the 911 recordings were not pristine but, prior to his trial, had been tampered with and altered by exporting and editing data, which was then recorded back onto the tape.  The experts stopped short of concluding the date of the 911 calls had been changed to October 25.

In ground two of his § 2254 petition, Mr. Pinder claimed the State presented false testimony at trial from Newley Welch that while he and Mr. Pinder were incarcerated together, Mr. Pinder confessed he had shot the victims and blew up their bodies. Mr. Pinder provided the post-trial court an affidavit from a private investigator who interviewed Mr. Welch in 2002 and reported that, contrary to his trial testimony, Mr. Welch stated that "John Pinder did not tell him that Pinder had shot or beaten Rex Tanner and June Flood."  Post-Conviction Record (PCR), R269-1 at 39.  The investigator also reported that Mr. Welch said "he would not testify in court regarding his admissions

---

[3] Mr. Pinder's record citation for this point shows that his own trial attorney, not the State, presented the logs when cross-examining Ms. DeHart.  *See* Trial R., R1780 Jury Trial Vol. 13 at 129-31.  The state-court records were filed in this court on a compact disc.  Our references to those records are to the names of the folders and files as set forth on that disc.

7

that he lied on the stand during John Pinder's trial . . . [until] he was released from probation." *Id.* at 38-39.

1. **State court rulings**

In affirming the denial of post-conviction relief on these claims, the USC relied solely on procedural default, reasoning that the claims could have been but were not raised "'at trial or on appeal,'" as required by Utah Code Ann. § 78B-9-106(1)(c). *Pinder II*, 367 P.3d at 976 (quoting § 78B-9-106(1)(c)). The court rejected Mr. Pinder's argument that the statutory term "at trial" did not include claims that could only have been brought in a post-trial motion prior to an appeal. *Id.* at 976-77. The court instead construed the term "at trial" as "encompass[ing] all claims that could have been raised *in the trial court*," including a post-trial motion. *Id.* at 976-77.

The USC next rejected Mr. Pinder's argument that he could not have brought these claims at trial or in his new-trial motion "because they came to light too late. " *Id.* at 977. The USC reasoned that Pinder knew of the grounds for asserting these claims "*at the time of trial*, and accordingly [they] could have been brought *then or* in his post-trial motion." *Id.* at 977 (emphasis added) (internal quotation marks omitted). "At most," the court said, Mr. Pinder had belatedly identified only "additional evidence supporting [the claims]," which was "insufficient to avoid the procedural bar." *Id.* In a concluding statement, the court summarized its holding: "Pinder could have asserted his due process claims [regarding the 911 tapes and Welch's alleged perjury] *at trial (or* on a post-trial motion)." *Id.* at 980 (emphasis added).

8

## 2. **District court ruling**

In his § 2254 proceedings, Mr. Pinder argued that to the extent the USC concluded that § 78B-9-106(c)(1)'s term "at trial" extended beyond the actual trial period, the procedural rule was novel and therefore inadequate to bar presentation of these claims in his new-trial motion. *See Walker v. Martin*, 562 U.S. 307, 316 (2011) ("To qualify as an 'adequate' procedural ground, a state rule must be firmly established and regularly followed." (internal quotation marks omitted)). In the alternative, Mr. Pinder asked the district court to excuse the procedural default based on the cause-and-prejudice and fundamental-miscarriage-of-justice exceptions.

The district court enforced the procedural default. The court explained that despite interpreting the term "at trial" to include post-trial motions, the USC found that the 911-tape and Welch-perjury claims could have been raised "during the actual trial." Aplt. App. at 240. Accordingly, the district court did not address Mr. Pinder's novelty argument.

The district court also declined to excuse the procedural default. The court characterized Mr. Pinder's excuse arguments as "hinging on 'newly discovered evidence,' so the exception [to procedural default] Pinder relies on is essentially that of fundamental miscarriage of justice or actual innocence." *Id.* The court determined that none of Pinder's evidence was new (which is a requirement for a showing of actual innocence, *see House v. Bell*, 547 U.S. 518, 536-37 (2006)), because he merely rehashed all the evidence and alleged civil-rights violations that formed "every claim that he brought before the Utah Supreme Court and in this petition, [and] re-argued [them] as

9

grounds for a finding of actual innocence." Aplt. App. at 241. The court did not separately address Pinder's cause-and-prejudice arguments.

### 3. **COA analysis**

In his COA Application, Mr. Pinder repeats his novelty argument but fails to address the district court's explanation that the USC's application of procedural default rested independently on the view that he could have brought these claims at his actual criminal trial (as opposed to in his new-trial motion). But reasonable jurists could not debate the district court's analysis, and the issue does not deserve encouragement to proceed further. Even if it was novel for the USC to interpret the statutory term "at trial" as including new-trial motions, the USC also based its procedural-default determination on the non-novel portion of the statute—that Mr. Pinder could have raised his claims during the actual criminal trial. The two bases were independent, and Mr. Pinder has not argued that the non-novel portion of the statute was inadequate.

Mr. Pinder attempts to overcome his procedural default of grounds one and two through a showing of cause and prejudice.[4] *See Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th Cir. 2009). We will address each ground separately. But before doing so, we note that in his § 2254 petition, Mr. Pinder failed to specify the precise constitutional basis for grounds one and two, asserting them as due process claims generally, but citing no case law. In ground one, he alleged the State "provided the defense with false and perjured evidence," namely, an altered 911 tape. Aplt. App. at 25. And in ground two,

---

[4] Mr. Pinder does not raise a fundamental-miscarriage-of-justice argument in his COA Application.

10

he alleged the State presented "false, perjured testimony of [a] jailhouse informant, Newly [sic] Welch." *Id.* at 33. When discussing these grounds in his reply to the State's response to his petition, Mr. Pinder referred numerous times to both *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959), which requires the prosecution to correct a witness's statement they know is false, and *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which requires the prosecution to disclose material exculpatory evidence.

His framing of these claims in his state-court filings was also mixed. For its part, the USC apparently treated them as *Napue* claims. *See Pinder II*, 367 P.3d at 977 ("Pinder asserts that Welch perjured himself at trial and that the State *knowingly* presented that perjured testimony." (emphasis added)); *id.* at 978 ("Pinder's second due process claim . . . is rooted in the allegation that the State *knowingly* presented doctored 911 tapes[.]" (emphasis added)).

We need not definitively resolve whether these are *Brady* or *Napue* claims (or both), because Mr. Pinder has not established his entitlement to a COA on them under either construct. With this understanding, we proceed with our analysis.

a. **911 tape**

"Cause for a procedural default can exist when some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Scott v. Mullin*, 303 F.3d 1222, 1228 (10th Cir. 2002) (internal quotation marks omitted). One such "objective factor external to the defense" is a "State's failure to disclose . . .

11

information." *Id.* at 1230. Mr. Pinder alleges that is the case here—the State failed to disclose that the 911 tapes had been altered.[5]

No reasonable jurist could agree with Mr. Pinder. The USC's discussion of why Mr. Pinder could have presented the 911-tape claim at his criminal trial is instructive. The USC stated that Mr. Pinder failed to identify any "clear ground for his assertion that [the 911-tape] claim could not have been presented at trial or on a post-trial motion." *Pinder II*, 367 P.3d at 979. The court noted that his only argument why he could not have presented this claim at trial or in a post-trial motion was that "at some point [the defense team] decided that the only way to have a valid claim was to see if there was an alteration of the tapes." *Id.* (brackets, ellipsis, and internal quotation marks omitted). The court considered this as nothing more than an assertion that counsel did not decide to investigate the matter until the post-conviction phase and reasoned that "[t]he same basis for the investigation by post-conviction counsel was as readily available to trial counsel." *Id.* The court further observed that "Pinder had ample grounds for pursuing an investigation into the date of the staged fight and subsequent 911 recording *at the time of trial*," specifically, conflicting testimony Ms. DeHart gave at her obstruction trial (October 24) and at Mr. Pinder's trial (October 25). *Id.* (emphasis added). Moreover, Mr. Pinder "had every motivation and opportunity to [pursue an investigation] at the time of trial." *Id.* Although trial counsel "did not have the results of the expert analysis during the trial and post-trial proceedings," the USC said "they had everything else, and

---

[5] For purposes of argument, we may assume the tapes were altered and the prosecution knew or should have known about it.

12

the additional evidence provided by the expert[s'] nebulous conclusions is insufficient in this context to undermine the conclusion that this claim 'could have' been brought earlier." *Id.* (footnote omitted). The "nebulous" quality of the experts' conclusions the court referred to was the fact the experts did not assert "that *the date* was altered in the 911 tapes" but "only that the recordings on both days had been altered in some fashion." *Id.* at 979 n.17.

We agree with this line of reasoning as it relates to cause for procedural default. Any failure by the State to disclose that the tapes had been altered did not prevent Mr. Pinder from raising this claim at trial given that (1) he knew Ms. DeHart previously identified, at her obstruction trial, the date of the fight as October 24; (2) the date was of extreme importance to Mr. Pinder because he claimed he had an alibi for the 24th; and (3) trial counsel had the same basis for investigating the tapes as post-conviction counsel. During his criminal trial, therefore, Mr. Pinder could have raised an issue about the date established by the tape logs even without the experts' analyses of the tapes. Accordingly, he fails to establish the cause prong of the cause-and-prejudice exception to procedural default. That alone is sufficient to enforce the procedural default. *See Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir. 1995) ("The 'cause and prejudice' exception is conjunctive, requiring proof of both cause *and* prejudice."). We therefore deny a COA on ground one.

### b. **Welch perjury**

Mr. Pinder questions the USC's determination that he could have raised his Welch-perjury claim at trial or in a post-trial motion. According to Mr. Pinder, he could

13

not have raised this claim earlier because he did not know about the claim's factual basis, which he characterizes as Mr. Welch's admission to the private investigator that he lied about Mr. Pinder's confession to the murders, until well after he filed his new-trial motion. He argues that prior to obtaining evidence that Mr. Welch perjured himself, he only had a "*belief* that [Mr. Welch was] not telling the truth" and that was insufficient "to formally allege that [Mr. Welch] committed perjury." COA Appl. at 33-34.

Whether Mr. Pinder could have made a plausible, formal allegation of perjury at trial is not the issue; his claim arises under either *Napue* or *Brady*. We begin with *Napue* and assume, for purposes of argument, that Mr. Pinder could not have brought a *Napue* claim at trial or in his new-trial motion. But he still fails to show that the refusal to consider this claim on the ground of procedural default would result in prejudice. The investigator's affidavit says nothing about the State's knowledge of Mr. Welch's alleged perjury. And actual knowledge is an element of a *Napue* claim. *See United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) ("A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution *knew* the testimony to be false, and (3) the testimony was material." (emphasis added)).[6] The USC pointed this out

---

[6] Relying on *Garcia*, Mr. Pinder contends that in this circuit, to prove a *Napue* claim, "a petitioner must prove the prosecutor knew *or should have known* of the falsity." COA Appl. at 37 (emphasis added). This contention rests on a clear misreading of *Garcia* and conflates *Napue* and *Brady*. Indeed, we have recently (and again) rejected the approach Mr. Pinder suggests, where a *Napue* claim would lie even when "the government unwittingly elicits false testimony." *Farrar v. Raemisch*, 924 F.3d 1126, 1132 (10th Cir. 2019). We have instead hewed to the approach detailed in *Garcia* and numerous earlier Tenth Circuit cases. *See id.* at 1132 & nn.7 & 8.

14

when it enforced the procedural default. *See Pinder II*, 367 P.3d at 978 (explaining that the investigator's affidavit said "nothing about the key element of the State's *knowledge* of Welch's alleged perjury at the time of trial—as there is no indication that the State was aware of the contents of the [investigator's] affidavit at the time it presented the Welch testimony at trial"). Thus, had the USC actually entertained the merits of this claim, it is clear Mr. Pinder would not have prevailed under a *Napue* theory.[7] And although the state post-conviction court never ruled on a motion for discovery Mr. Pinder filed to, as he now puts it, "find out exactly what law enforcement knew," COA Appl. at 30 n.6, Mr. Pinder develops no argument that the post-conviction court constitutionally erred in doing so or that the USC committed constitutional error in finding no abuse of discretion in the effective denial of the discovery motion, *see Pinder II*, 367 P.3d at 980-81. For these reasons, we deny a COA on ground two to the extent it is based on *Napue*.

Construed as a *Brady* claim, Mr. Pinder fares no better, as he cannot establish cause for his failure to bring a *Brady* claim at trial or in his new-trial motion. A *Brady* claim has three components: (1) "evidence . . . favorable to the accused"; (2) "suppress[ion] by the State, either willfully or inadvertently"; and (3) ensuing "prejudice." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Suppression of relevant

---

[7] To the extent the USC's statement could be construed as a ruling on the merits, we would conclude that reasonable jurists could not debate that the USC reasonably applied *Napue*.

15

evidence is tantamount to cause for procedural default of a *Brady* claim. *See id.* at 282

(explaining that cause can "parallel" the suppression component).

Mr. Pinder has not identified any relevant evidence the State suppressed. The

evidence on which he bases his claim is the investigator's affidavit, which the State could

not have suppressed because Mr. Pinder's own investigator developed it for Mr. Pinder's

use. Moreover, Mr. Pinder's argument that the State should have known of the perjury

and, presumably, disclosed that "fact" to Mr. Pinder at trial rests *only* on the many

grounds the USC identified as trial evidence that Mr. Welch was lying, *see Pinder II*,

367 P.3d at 978 n.15. Because those same grounds were equally evident to Mr. Pinder at

trial, there was no suppression. *See United States v. Erickson*, 561 F.3d 1150, 1163

(10th Cir. 2009) (explaining that under *Brady*, "a defendant is not denied due process by

the government's nondisclosure of evidence if the defendant knew of the evidence

anyway."). Even more fundamentally, Mr. Pinder knew better than anyone whether

Mr. Welch was lying because the testimony concerned a matter squarely within

Mr. Pinder's knowledge—his confession to Mr. Welch. For these reasons, there was no

suppression and therefore no cause for the procedural default. Accordingly, we deny a

COA on ground two to the extent it is based on *Brady*.

B.    **Ground three and Ruiz portion of ground four**

Ground three of Mr. Pinder's § 2254 petition involved a *Brady* claim he raised in

his motion for a new trial, asserting the State suppressed material evidence concerning

Mr. Ruiz's (1) alleged involvement in the prior, unrelated kidnapping and murder of

Todd Skidmore and (2) alleged drug-dealing membership in the Mexican Mafia. Ground

16

four concerned two separate *Brady* issues: The State failed to disclose exculpatory evidence regarding plea agreements with Mr. Ruiz and Mr. Brunyer.

Like the district court, we address the Ruiz portion of ground four together with ground three, and discuss the Brunyer portion of ground four separately. The trial court denied relief on the merits of these claims. The USC affirmed, also on the merits. *See Pinder I*, 114 P.3d at 558-60.

In ruling on ground three of the § 2254 petition and the Ruiz portion of ground four, the district court began by noting that "Pinder's arguments are fatally flawed by their cursory nature and failure to analyze issues under the federal habeas standard of review" and by his failure to "refer to any caselaw at all, let alone the controlling case, *Brady*. For each issue, Pinder merely lists evidence with his spin on it." Aplt. App. at 244. The court concluded that nonetheless, the USC "selected the correct governing legal principle with which to analyze these alleged evidentiary suppression issues: *Brady* and its progeny." *Id.* at 244-45 (citation omitted). The district court noted that, unlike Mr. Pinder, it had "thoroughly evaluated whether the Utah Supreme Court reasonably applied *Brady* as to Ruiz's involvement in the Skidmore murder" and concluded that "[t]he Utah Supreme Court reasonably applied *Brady*, particularly lacking any substantive argument by Pinder to the contrary. Pinder has utterly failed to meet his burden under the federal standard of review here." *Id.* at 246.

Mr. Pinder finds "odd" the district court's observation that he failed to analyze this issue under the AEDPA standard, and he notes that in reply to the State's assertion of AEDPA "*as a defense* in its Response, he responded [in his § 2254 reply] with a 37-page

17

legal argument explaining why that standard did not apply." COA Appl. at 52 n.10 (emphasis added). However, we read the district court's decision as declining to consider the substantive arguments in Mr. Pinder's § 2254 reply because they came too late. *See Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 676 n.9 (10th Cir. 2016) ("We generally do not consider arguments raised for the first time in a reply brief."). And contrary to Mr. Pinder's argument, "AEDPA's standard of review is not a procedural defense, but a standard of general applicability for all petitions filed by state prisoners after the statute's effective date presenting claims that have been adjudicated on the merits by a state court." *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009) (ellipsis and internal quotation marks omitted). It was therefore Mr. Pinder's obligation to explain to the district court in his § 2254 petition why AEDPA did not apply. Waiting until his § 2254 reply was too late. And the failure to "raise [an] issue at the appropriate time" in the district court "waive[s] appellate review." *Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1246 n.3 (10th Cir. 2012).

Accordingly, we will not consider any of the arguments in the COA Application regarding the USC's rulings on the merits of these grounds because they were all first broached in the § 2254 reply. And nothing in the USC's analysis strikes us as being an unreasonable application of *Brady*. Consequently, reasonable jurists could not debate that it was within the district court's discretion to deny relief on ground three and the Ruiz portion of ground four without consideration of the specific arguments Mr. Pinder raised in his § 2254 reply, and the issue does not deserve encouragement to proceed further. We therefore deny a COA on ground three and the Ruiz portion of ground four.

18

C.      **Brunyer portion of ground four**

Mr. Pinder attempted to raise the Brunyer portion of ground four in a motion to amend the PPCR.  He alleged the State failed to disclose the full terms of its agreement with Mr. Brunyer to obtain his testimony  at Mr. Pinder's trial, specifically "that Brunyer received promises including an offer of probation in exchange for his testimony."  PCR, R629-270 at 622.  The only "good cause" he identified for allowing the amendment was that he had discovered the basis of the claim only after the State filed its response to his PPCR.  *Id.*  The post-conviction court denied the motion without explanation, and the USC affirmed.  The USC ruled that, despite the lack of explanation, the trial court did not abuse its discretion in denying the motion to amend because the reason was evident: Mr. Pinder filed the motion four years after he had filed his PPCR and a full year after the State had filed a motion for summary judgment in the post-conviction proceeding. *Pinder II*, 367 P.3d at 980.  The USC reasoned that "Pinder had plenty of time to discover the facts purportedly meriting an amendment."  *Id.*

In his § 2254 petition, Mr. Pinder summarily argued that the state courts denied his Brunyer claim on "a new rule of procedural default," and therefore the district court owed no AEDPA deference in ruling on the merits.  Aplt. App. at 45.  He then discussed the merits, relying on the affidavit of Melissa Cowles that she believed the prosecution offered Mr. Brunyer a plea deal in exchange for his testimony.  Mr. Pinder claimed the existence of a plea deal with Mr. Brunyer and "the offer of payment of monies to him in exchange for his testimony" was not disclosed to the defense, and had the jury heard of these things, it is reasonably probable it would not have convicted Mr. Pinder.  *Id.*  In

19

response, the State argued that Mr. Pinder failed to acknowledge the procedural problem with this claim and failed to offer any excuse for his delay in raising it in the post-conviction proceeding. Mr. Pinder replied that § 2254(d) did not bar review because the state courts never adjudicated the claim on the merits. In the alternative, he summarily asserted that his default could be excused by either the cause-and-prejudice or fundamental-miscarriage-of-justice exceptions, although he developed no argument on either exception.

In a footnote, the district court concluded that "[p]rocedural default also applies to Pinder's argument that information about Brunyer's potential plea deal was suppressed à la *Brady*. *See Pinder [II]*, [367 P.3d at 980] ¶ 61." Aplt. App. at 249 n.3.

In his COA Application, Mr. Pinder makes no argument that the state court applied a new rule of procedural default, but argues only that cause and prejudice excuses any default:

> The state court's application of the procedural bar should be excused because the state did not disclose its offer to Brunyer, and thus, there is cause and prejudice for any default. See, pgs. 25-27, above [where, in relevant part, he argued that the failure to disclose the allegedly altered 911 tapes constituted cause].
>
> Brunyer provided the sole testimony corroborating Ruiz's version of the cleanup and the failure to disclose the prosecution agreement with Brunyer warrants relief under the de novo standard of review.

COA Appl. at 57.

These conclusory arguments are unconvincing. First, Mr. Pinder does not even allege that Mr. Brunyer accepted any offer that may have been made in Ms. Cowles's presence. And Ms. Cowles's affidavit does not establish that the State entered into an

20

agreement with Mr. Brunyer. Ms. Cowles said that while she was waiting to testify, she was in a room with Mr. Brunyer, the prosecutor, and others. She continued: "One of the men handed Brunyer a document that was about 3 pages long. I heard them say the word 'testimony' and also heard them talking with Brunyer about 'probation,' but I can't recall the exact conversation or words. I believed then, and believe now, that Brunyer was being offered a deal for hi[s] testimony." PCR R629-270 at 619-20 (some internal quotation marks omitted).

This falls far short of demonstrating that Mr. Brunyer accepted a deal in exchange for his testimony. Lacking that, there was nothing for the State to disclose to Mr. Pinder under *Brady*, so Mr. Pinder cannot establish cause for his delay in broaching the claim in the post-conviction proceeding. Furthermore, Mr. Pinder fails to establish a debatable argument that if Ms. Cowles's testimony had been presented at trial, there is a reasonable probability that Mr. Pinder would not have been convicted of the murders. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (reiterating rule that prejudice in the context of a defaulted *Brady* claim "exists when the suppressed evidence is material for *Brady* purposes" (internal quotation marks omitted)); *Garcia*, 793 F.3d at 1207 (explaining that materiality under *Brady* requires showing "a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed" (internal quotation marks omitted)). Accordingly, Mr. Pinder has not met his burden to show that reasonable jurists could debate whether the Brunyer portion of ground four should have been considered on the merits by the state court or the federal district court, or that the

21

issue deserves encouragement to proceed further.  We therefore deny a COA on the Brunyer portion of ground four.

## IV.  **Conclusion**

For the foregoing reasons, we deny Mr. Pinder's COA Application and dismiss this matter.

Entered for the Court


Jerome A. Holmes
Circuit Judge

22